Argued at Pendleton May 2; affirmed June 20, 1939

# JONES ET AL. *v.* WARMSPRINGS IRRIGATION DISTRICT ET AL.

(91 P (2d) 542)

In Banc.

*Blaine Hallock,* of Baker, and *Ed. R. Coulter,* of Weiser, Idaho (Hallock, Donald & Banta, of Baker, Ed. R. Coulter, of Weiser, Idaho, and M. A. Biggs, of Ontario, on the brief), for appellants.

*P. J. Gallagher,* of Portland, for respondents.

BEAN, J. This is a suit to prevent the defendant, Warmsprings Irrigation District, and Stanley Mallett, water master of Malheur county, Oregon, from depriving the plaintiffs of the full use of the water right decreed to them. The parties are appropriators of water from the Malheur river, a perennial stream, the south fork of which heads in Harney county, to the southeast of Crane, from whence it flows toward Riverside in Malheur county, where the middle fork joins. It then flows on to Juntura, in Malheur county, where the north fork joins, and thence on to the Snake river valley, where it empties into the Snake river near Ontario. The nature and topography of the river bed is such that from the point on said stream, where plaintiffs use water, to the headgates of the Nevada ditch on the river, is a distance of about 65 miles in a direct line. The flow of the water in the Malheur river is seasonal in character. While there is an abundant supply of water in the stream during the early part of the season, the flow rapidly diminishes during the early summer.

The Warmsprings Irrigation District constructed a reservoir on the middle fork of the Malheur river, completing the same in 1920 at a cost of approximately $1,550,000 by the sale of bonds. There are 1,989.5 acres of land within the district that enjoy a direct flow priority of 1881 through the Nevada ditch. All of the lands within the district, including those under the Nevada ditch which enjoy the earliest stream flow priority of 1881, carry a supplemental storage right. The lands in the district and in the vicinity thereof are semiarid and require irrigation in order to produce abundant crops. Plaintiffs' lands, exclusive of Bernice Platt as to whom the complaint was dismissed, have later priorities, from 1885 to 1905 inclusive, and are situated on the north fork of the Malheur river, outside of the irrigation district. From 1920 until 1928 the water supply in the district, with the use of the reservoir, was very plentiful and the parties used the water very generously and extravagantly upon the lands with the result that 50 to 75 per cent of the lands in the district were waterlogged and unsatisfactory for cultivation.

In April, 1926, the irrigation district entered into a contract with the United States government to sell one-half of its right to the reservoir and one-half of its right to the water therein to the government. The water right in the reservoir was sold to the government as surplus water.

The water that was used excessively on the lands of the district during this time did not seep back to the river in time to use it for irrigation that season, but seeped back very slowly for the most part late in the season, after the irrigation season had ended.

In the contract between the irrigation district and the Bureau of Reclamation of the United States, it was arranged that the United States would construct drains from a large part of the land in the district to the river to reclaim the lands that had been waterlogged, thereby accelerating the return flow of seepage or waste water from the lands after the lands had been irrigated. The testimony in regard to this seepage is about as follows, Mr. Purvis, a witness for plaintiffs, testifying:

"Q. During those years prior to the construction of the drainage system, would any appreciable quantity of this water get back into the river during the irrigation season in which it was put on the land?

A. Very little of it returned to the river.

Q. That prevailed generally, did it, over all the lands from the head of the Nevada ditch up?

A. Quite generally.

\* \* \* \* \*

A. In the upper part of the valley it didn't get out during the winter time, the water didn't get returned to the river scarcely at all."

Jake Russell testified on the same subject as follows:

"Q. Now, Mr. Russell, from your observation prior to the building of these drains, was there any appreciable quantity of this water which was placed upon the land in any irrigation season that seeped back into the river for use in the same season, or not?

A. Well, that is hard to determine, but it was very little if any, because the water seemed to stand there and recede very slowly, and be quite high yet at the beginning of the next season's irrigation, in most cases."

George McLaughlin testified as follows:

"Q. Before drainage, what would you say as to whether or not the water applied on the land in any

irrigation season came back into the river for use during the same irrigation season?

A. I don't think much of it would get back.''

Stanley Mallett testified:

''Q. What was the fact as to whether or not, prior to the construction of these drains you told us about, there was any appreciable seepage of that water off those lands back into the river at any time during the irrigation season, while it could be employed for any purpose?

A. The seepage was very light during the irrigating season.

Q. Was there anything of any consequence that would augment the flow of the stream during the irrigation season prior to the construction of these drains?

A. No.

\*      \*      \*      \*      \*

Q. What can you say as to whether any of these waters developed as you have described, ever would have found their way into the river in any quantity available for irrigation?

A. Very little found its way to the river until late in the season—that is, in the late fall and winter. There was some natural seepage during the season until probably the lowest level of the water table would be toward spring, when irrigation was commencing.

Q. As the water was poured on to the land in this irrigation process, it would be retained and held until late in the season?

A. Yes; it was that process that ruined the land, forced the alkali to the surface by the water that was held back in the subsoil.

Q. With that as the situation, did you, or did any of these directors of the district, or officers of the district, or people within the district, to your knowledge, ever treat those waters developed by the drains as any part of the normal flow of the stream?

A. No.

Q. And where would that water from waterlogged lands drain back into, naturally?

A. Where would it drain back in naturally? You mean before the drains were constructed?

Q. Yes.

A. Oh, through the winter season it is drained into the rivers, different points.''

The water rights of the Malheur river have been adjudicated and all the relative dates of priority of the different water users from the river have been established by decree entered in May, 1925.

The Warmsprings Irrigation District was organized in about the year 1916. The main purpose of the organization of the district was to construct a reservoir on the middle fork of the Malheur river, and impound surplus and flood water to supplement the water rights to lands in the district. The district originally covered some 30,000 acres, but at present irrigates about 15,000 acres. The Warmsprings Irrigation District applied to the state engineer for and was granted a permit to store the flood waters in a reservoir for irrigation and power purposes to supplement the supply for the irrigation of lands in the irrigation district having a partial water right. The permit was limited to one-eightieth of one cubic foot per second for each acre irrigated, including water heretofore appropriated from the direct flow of the Malheur river. The certificate of water right of the water board dated April 13, 1921, fixed a priority of right thereby confirmed, dating from April 8, 1914. The amount of water entitled to be stored each year under such right ''shall not exceed 200,000 acre-feet.''

One of the questions decided by the trial court and presented upon this appeal is, shall the return flow

from the lands within the Warmsprings Irrigation District be used to satisfy the 1881 rights as part of the natural flow of the river?

The trial court held that the plaintiffs were entitled to have all of the waste and return flow water from the lands within the Warmsprings Irrigation District which returned to the river above the head of the Nevada ditch, used by the defendant Warmsprings Irrigation District to satisfy the rights and demands of the lands irrigated under the Nevada ditch with the 1881 priority.

It is the contention of the defendants, in substance, that the return flow from the drainage ditches on the land in the district is, in effect, stored water and that the district is entitled to use the same upon rights junior to the 1881 rights and junior to the plaintiffs' rights, or, in effect, that the water which had been impounded in the reservoir and discharged therefrom and utilized by irrigating the land, had been recaptured by the irrigation district and could again be used without such water becoming a part of the negative community.

■ It will be noticed from the statement above, and it is plainly shown in the record, that the irrigation district, from 1920 until 1928, irrigated the lands of the district from the natural flow and from the reservoir and permitted the water to escape. It was allowed to be used in such volume that it injured the lands and waterlogged them, so that a large part of the lands were unfit for cultivation. This excess or waste water for the most part returned slowly to the river. There was no intention evinced to recapture this waste water. On the other hand, circumstances were such that it

was desirous of getting rid of it. For about eight years there was no semblance of any act or anything to indicate that it was the district's intent to recapture such water, and we think, inasmuch as actions speak louder than words, that this water was abandoned from 1920 to 1928.

It is stated in 2 Kinney on Irrigation and Water Rights, (2d Ed.) and we think it is the law in regard to such matters, as follows:

"But, as is the case with the abandonment of a water right, the intention of the owner must govern. However, the intent may be implied from the acts themselves of the owner, and from these acts an abandonment of the right to use the works will be presumed; and if the works are not used for an unreasonable time, connected with other acts showing that the owner has no intention to use the works in the future, an abandonment of them will be presumed." p. 1995, § 1108.

"Therefore, it follows that where the water is turned into a stream for the convenience in conducting it to the place of use, with the express intention of recapturing it, there can be no intention to abandon the water. But the intent to recapture the water must be present at the time it is discharged into the stream." p. 2009, § 1114.

"Where, after use by a prior appropriator, water is discharged into a stream for the purpose of drainage or as a convenient method of disposing of it, and without any intent upon the part of the owner of the right to reserve or recapture it, it works an abandonment of such water, and the water thus discharged becomes a part of the natural stream, and is subject to reappropriation and to the same rights as the water naturally flowing therein, and can not afterward be taken out by the original appropriator to the injury of other rights which have attached and vested to it." p. 2006, § 1114.

██ We find in 1 Wiel on Water Rights (3d Ed.) the following statements:

"* * * Waste water returned to the natural stream from which taken belongs to the appropriators below thereon, whether it comes by percolation, surface or subterranean flow." p. 317, § 303.

"The water taken into an artificial structure and reduced to possession is private property *during the period of possession.* When possession of the actual water or *corpus* has been relinquished or lost, by overflow or discharge after use, property in it ceases; the water becomes again nobody's property and re-enters the negative community, or 'belongs to the public,' just as it was before being taken into the ditch. It has no earmarks to enable its former possessor to follow it and say it is his. The specific water so discharged or escaped is abandoned; not an abandonment of a waterright, but an abandonment of specific portions of water, viz., the very particles that are discharged or have escaped from control." p. 36, § 37.

"The leading authority in the common law for this comparison is Blackstone, who says: 'But, after all, there are some few things, which, notwithstanding the general introduction and continuance of property, must still unavoidably remain in common; being such wherein nothing but an *usufructuary* property is capable of being had; and, therefore, they belong to the first occupant, during the time he holds possession of them, and no longer. Such (among others) are the elements of light, air and water; * * * The statement applies only to the *corpus* of the water (the ownership of the usufruct has been evolved into the law of riparian rights, or in the West, into the law of appropriation), and shows how the *corpus* is not the subject of property while flowing naturally, is private property during capture, and again ceases to be property when possession ceases (property in the corpus being lost by escape of the water or its abandonment, whereupon the particles again cease to be his property, and are again nobody's property, completing the cycle.)" p. 29, § 33.

■ It is further stated at page 43 of the same volume, in substance, that the point which distinguishes these cases is the intent existing at the time the artificial increment to the stream is produced, not to abandon it, but, on the contrary, always intending to reclaim it, and the carrying out of that intent within a reasonable time. The intent to recapture the water must be present at the time it is discharged from control and must be very clearly shown; otherwise, an injunction will lie to prevent its recapture. The intent to recapture is essential, and without it the water is abandoned and cannot be reclaimed against claimants on the river existing at the time the recapture is attempted. See, also, *Brosnan v. Boggs*, 101 Or. 472, 198 P. 890.

We think this is a correct statement of the law. It will be noticed that the intent should exist at the time the water is discharged. For eight years there was no indication of any intent to recapture this excess water, and the alleged attempt was not made within a reasonable time.

In *United States v. Haga,* 276 F. 41, 46, a case cited by defendants, which we think is in favor of plaintiffs, we find the following:

"His upper ditch was constructed in 1908, after several years of open abandonment of the water by the canal company, and thereafter he continued to divert the water through the upper ditch without interference or objection for five years, up to the time the second contract between the canal company and the government was entered into, during all of which period the canal company continuously permitted the water to waste and manifested no intention to recapture or again use it. Clearly, it must be held to have abandoned such right as it may have had; at least, it could not under such circumstances reclaim the water and dispose of it to a third person to be used in any other territory,

to the detriment of one who in good faith had appropriated it and was using it for beneficial purposes."

This court in *Hutchinson v. Stricklin,* 146 Or. 285, 298, 28 P. (2d) 225, adopted the rule found in 1 Wiel on Water Rights (3d Ed.) pp. 316 and 317, that "Waste water returned to the natural stream from which taken belongs to the appropriators below thereon, whether it comes by percolation, surface or subterranean flow."

■ In the case of *In re North Powder River,* 75 Or. 83, 93, 144 P. 485, 146 P. 475, it is stated:

"Although some of the textwriters and the decisions of some of the courts seem to recognize that the appropriator may sell the water separately from the land, this is only upon the theory that the appropriator owns the water, and not merely the right to use it for a particular purpose; but, in states in which legislation relating to the use of water has been enacted, it is not the water but the use of it for a particular purpose that is the limit of the right, and, when not needed for that purpose, the next person in priority of time is entitled to it, and a prior appropriator cannot sell it to a stranger to the injury of a subsequent appropriator."

■ We read in *Broughton v. Stricklin,* 146 Or. 259, 277, 28 P. (2d) 219, 30 P. (2d) 332:

"We do not question the general rule that where a party has a prior right to a certain quantity of water he is entitled to it, but only to the extent needed for the use to which it is appropriated. Thereafter the next person in priority is entitled to it when temporarily not needed by the prior claimant, * * *."

■ As soon as the water wastes back or percolates from lands now in the district or leaves the control of the owner of such lands, it becomes free, unappropriated water and a part of the stream flow and other

users from the stream immediately acquire the right to have such water appropriated to their benefit. In this case the plaintiffs are owners of rights next in point of time to the Nevada ditch right and have the right to demand that such waste water be applied to satisfy the Nevada ditch right before their gates are shut down in order that the Nevada ditch right be filled.

There is no contention made here that either the district or any landowner attempted to or claimed the right to the control of this return water from the time it began to appear until as late as 1927. It is now contended that the district, in 1927, had determined to use part of the return flow after that date on lands under the Nevada ditch, so that that water might be available to rights junior to the plaintiffs. No steps of any nature were taken to appropriate this water. No minutes or records were produced to show an intention on the part of the district to use the water for any purpose.

■ Defendants contend that they have the right to take the return flow of the water from the drainage within the district and that all the natural flow water had been drained from the lands within the district before the plaintiffs were required to release the water from the upper river and that the return flow from there after that time within the district was from storage water and not from natural flow.

The fact that the seepage or waste water might be from waters once held in a reservoir does not change the rule. The seepage was not from the reservoir but from the land which had been fully irrigated. The reservoir waters had been fully used for the purpose for which they were impounded and seeped and ran off the lands and returned to the stream and abandoned.

In *Trowel Land & Irri. Co. v. Bijou Irri. Dist.*, 65 Colo. 202, 176 P. 292, 297, we read:

"The law makes no distinction, as relates to the return of waters to the stream, between that from a reservoir supplied by a natural stream, or from a ditch supplied directly from the stream, regardless of the fact that the reservoir may be chiefly supplied in time of high water, or in the nonirrigation season."

It is stated in *Comstock v. Ramsay*, 55 Colo. 244, 133 P. 1007, as follows:

"Every appropriation of water on this stream, claimed and decreed for irrigation purposes, has been so claimed and decreed upon the theory that all waste and seepage water arising from the irrigation of land, or from the construction and maintenance of reservoirs using water from the river, and naturally returning to it, is available to supply such appropriations and decrees."

We fail to recognize any distinction, where water is used for irrigation, between the natural flow and the flow from a reservoir, where it is allowed to escape and permitted to seek the level of the country for about eight years without any indication of an intent to recapture it. As said by the trial court: "The water which drains back into the river from the lands within the Warmsprings District cannot be said to be stored water. One of the primary requisites to the right to recapture and use water is that the party intending to recapture the water must be able to identify it. He must be able to measure the water as he puts it into the stream and identify it where he takes it out, at least as to amount." We concur in this statement. There was no attempt made by the district or any landowner to identify or measure this waste water.

■ Section 47-402, Oregon Code 1930, provides:

"Subject to existing rights, all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; * * *"

After the return flow waters, so-called, or waste waters from the irrigation district lands had been abandoned and reached the Malheur river, becoming a part of that river, no one had a right to take the same from the river except by regular appropriation.

In the early case of *Brosnan v. Harris,* 39 Or. 148, 65 P. 867, 54 L. R. A. 628, 87 Am. St. Rep. 649, Mr. Justice ROBERT S. BEAN said:

"Whatever doubt may exist elsewhere upon the question, it would seem that the right to make such an appropriation of waste, spring, or seepage water finds recognition in the legislation of this state."

■ As stated above, the dates of relative priority of the different water users of the Malheur river have been adjudicated and established and the use of this waste water, when it returns from the lands of the district to the river, is governed by the decree of May, 1925.

The defendants claim the right to use the waste or return flow water from the lands in the district in satisfaction of the rights of landowners under the Nevada ditch with priorities junior and inferior to plaintiffs. The fact that there is some return flow water from irrigated lands we do not think would change the dates of relative priority.

In the case of *Hutchinson v. Stricklin,* supra, we read:

"The system adopted by the lawmakers of this state, in the water code and its amendment and other statutes, when the water rights of the several parties

on a stream and its tributaries have been adjudicated, may be likened to a network, all the different parts of which form a complete whole. To a certain extent, one right depends upon another, and if a part of the network is displaced it will disarrange and prejudice the other parties, although the part removed is a prior right, with a date of relative priority, earlier than many of the other rights, and it would be something like taking a link out of a chain. The legislature of this state, in its wisdom, has provided for this condition.''

■ The defendants term this waste or seepage water as ''developed water.'' The drains were constructed by the government of the United States in part payment for the one-half interest in the reservoir and water rights of the district. We do not think that any new water was developed. The construction of the drains merely accelerated the flow of seepage and waste water back into the river, but no new water was developed. *Trowel Land & Irri. Co. v. Bijou Irri. Dist.*, supra; *Rio Grande Reservoir Ditch Co. v. Wagon Wheel Gap Imp. Co.*, 68 Colo. 437, 191 P. 129.

It appears that the drains were constructed by the government for the irrigation district mainly to reclaim the waterlogged lands. This is shown by there being several drains below the head of the Nevada ditch, which is the last intake downstream of the water from the river.

In regard to seepage water, Stanley Mallett, one of the defendants and water master for the district, testified:

''A. There was a natural seepage probably through the season but not a considerable amount because each succeeding year showed more land waterlogged and the water table closer to the surface.

Q. * * * Would a considerable amount of that water seep back into the river, anyway?

A. Yes, but not during the irrigation season, Pat. It would fill up during the irrigation season and seep slowly back through—usually begin when the ground water was at the highest. Very little of it was recovered at a time when it could be used; that was the point."

The witness Kennard testified:

"Q. Counsel asked you whether or not the water that was in these lands, saturated into these lands, could be available for irrigation, or for capture for irrigation, before the drains were built, and you said no. Now, why not?

A. I didn't say positively no; I said generally speaking, it would usually return to the river at a date so late that it was not available for irrigation.

Q. Well, they irrigated out here from 1920 until they built these drains and they were just applying that water in there as fast as they could run it out; it had to go some place. Where did it go?

A. It returned to the river later in the season.

Q. Wouldn't it drain out every season and then fill up again?

A. The water table would lower each year, the water table measurements show that that water remained there and didn't start to go down until the last of September and October, after the irrigation was over, then the water table started dropping, part of it running to the river * * *."

And the witness Cunningham testified:

"A. * * * There was some water returned gradually throughout the entire year, but a good share of the water applied passed off through evaporation, coming to the surface in low places, and bringing with it the white, brown, and black deposits which indicate alkali."

In the contract between the United States and the irrigation district, provision was made that the return flow or waste water from the Vale-Oregon project should be used by the irrigation district and that the district should compensate the United States for the same by water from the reservoir. Something is said in the brief in regard to this return flow from the Vale-Oregon project and in the opinion of the trial court. This matter of the return flow from the Vale-Oregon project is regulated wholly by contract between the district and the United States. The United States is not a party to this suit, and, as we view it, the matter of the return flow water from the Vale-Oregon project is not involved in this suit. In so far as the return flow water from the Vale-Oregon project has any influence upon the questions involved in this case, it appears from the record that this return flow was accurately measured and not abandoned as the waste from the irrigation district was. We do not think that this waste water from the irrigation district lands was governed by any different rule after the construction of the drains from what it was before.

The trial court was satisfied that the plaintiffs did not receive their full three acre-feet of water in 1934 and 1935, and we concur in this finding.

█ Plaintiffs filed a cross-appeal claiming some damages. The trial court, while of the opinion that the plaintiffs suffered some damages, found that under the state of the record it was impossible to establish any amount which the court was justified in charging against the defendants. The trial court heard the testimony of the witnesses and some of the plaintiffs plainly stated that they were not interested in the question

of damages. We feel that the trial court was in a better position to pass upon this matter than is this court. The testimony on this phase of the case is very indefinite and unsatisfactory. Equity does not demand a judgment for damages.

Defendants cite the case of *Barker v. Sonner*, 135 Or. 75, 294 P. 1053, and other like cases. In that case the waters which plaintiffs claimed were brought to the defendants' lands pursuant to a contract, or presented themselves by the process of seepage, and while those waters were still upon the defendants' lands the plaintiffs claimed the right to enter upon that land and divert the water. As we understand that case, it is authority for one to recapture seepage water on his own land. The facts are entirely different from the case in hand.

■ It is said that there are other parties with water rights superior to those of plaintiffs and inferior to those of the Nevada ditch rights of 1881. It was held by the trial court that these parties are not asking for any relief or claiming any rights in this suit, and we do not think this matter would change or affect the rights of the parties to this suit.

The fact that water used by an appropriator for a beneficial purpose in irrigating land becomes appurtenant to the land is mentioned in the briefs in connection with the use of the water from the reservoir, but we fail to see that this fact would have any influence upon the dates of relative priority or that it is material to the issues in this case.

■ Defendants complain because the court did not grant a further hearing in the case. It seems from the record that the matters are all presented thereby and

that there was no necessity for the taking of further testimony. We think there was no abuse of discretion in not allowing the case to be opened for taking such further testimony.

The decree of the circuit court is affirmed in accordance with this opinion.

Plaintiffs are entitled to costs on this appeal.

BAILEY and LUSK, JJ., not sitting.