**UNITED STATES et al. v. WARMSPRINGS IRR. DIST. et al.**

No. 774.

District Court, D. Oregon.

Nov. 13, 1940.

Carl C. Donaugh, U. S. Atty., J. Mason Dillard, Asst. U. S. Atty., and B. E. Stoutemyer, Dist. Counsel, U. S. Reclamation Bureau, all of Portland, Or., for plaintiff United States.

Robert D. Lytle, of Vale, Or., for plaintiff Vale Oregon Irr. Dist.

Ed. R. Coulter, of Weiser, Idaho, and W. H. Strayer, of Baker, Or., for defendant Warmsprings Irr. Dist.

I. H. Van Winkle, Atty. Gen. of Oregon, Rex Kimmell, Asst. Atty. Gen. of Oregon, and Max S. Taggart, Dist. Atty., of Vale, Or., for defendant Stanley Mallett.

JAMES ALGER FEE, District Judge.

The Malheur River is a perennial stream in which the flow of water is seasonal, varying from flood conditions in spring to an extremely small flow in late summer. This stream heads in three different localities, and the resultant water courses are known respectively as the South Fork, Middle Fork and North Fork of the Malheur. These branches have united, just below Juntura, Oregon, as the Malheur River, which flows in a northeasterly direction and empties into the Snake. Willow Creek runs in a southeasterly direction to join the Malheur, some fifteen miles from the junction of the latter with the Snake.

The Warmsprings Irrigation District comprises lands lying on both sides of the Malheur from its mouth to the junction with Willow Creek, and on both sides of Willow Creek and the Malheur for some distance above the junction. The lands of the District thus form a rough "Y" with the stem to the east but with the Willow Creek branch foreshortened.

This District in 1920 constructed a reservoir for storage waters on the Middle Fork of the Malheur. As a result of extravagant use of water by this District certain lands thereof became waterlogged and the United States built drains to draw off and discharge the surplus into the Malheur.

After considerable investigation and negotiation, in which the State of Oregon, the Warmsprings District and Malheur County, a municipal body in which all the lands are located, took part, the United States, beginning in the fall of 1927, built a system of dams and canals for the reclamation of the Vale Irrigation Project. An irrigation district was formed known as the Vale Irrigation District which comprises lands which follow the interior of the contours of the branches of the "Y" and extend in prolongation thereof. Generally speaking, these lands are westerly of and upstream from the bulk of lands in the Warmsprings District.

The United States took water from the Malheur by diversion at Namorf, some miles below the junction of the North Fork, under the state law of appropriation. The water distributed by the Warmsprings Irrigation District, whether natural flow or storage water, passes this point and is distributed through ditches a considerable distance beyond the government diversion works. The Nevada Ditch, among others belonging to the District, diverts water from the stream at the fork of the "Y" and downstream from all the lands irrigated in the Vale Project. In 1935 the United States as a part of the system of works to supply the Vale Irrigation Project constructed the Agency Reservoir upon the North Fork of the Malheur.

It is obvious that whatever water escapes from the Agency Reservoir by seepage or otherwise will find its way into the Malheur River, except such quantity as may escape underground completely or evaporates. This is true as to water which flows on the ground or seeps through the

soil after it has been used to irrigate the lands in the Vale Irrigation Project. It is equally clear that some of this water will come into the Malheur or the ditches of the Warmsprings District.

The Warmsprings District was sued by certain water users not in any district because of its claim to use the water which ran off or was drained off irrigated lands of the District in filling other water rights. The Supreme Court of Oregon held that since this water had been allowed to waste into the Malheur for a period of several years, the right to claim this "return flow" had been abandoned and lost.[1]

■ All problems in relation to the water which escapes from a reservoir or from lands after use in irrigation are complicated by the difficulty of measurement[2] and the use of the words "return flow". This phrase seems not to have been defined judicially[3] or otherwise. The definition, however, suggested by the contexts generally is water drawn from a stream and impounded or used in irrigation which subsequently arrives again at the stream from which it was initially abstracted. The contexts also suggest that "return flow" may be found either in surface or percolating waters.

This litigation arises over the construction of the provisions of a contract between the United States and the Warmsprings Irrigation District dated April 30, 1926. The government is claiming credit in water stored in the Warmsprings Reservoir for return flow, drainage and waste water from the Vale Project. The specific question is whether the Warmsprings District is required to allow such credit for water lost from the Vale Project by deep percolation which subsequently appears in water courses where such water can be diverted onto the Warmsprings Project or solely for water which flows off the Vale Project on the surface.

The specific provisions of the agreement of April 30, 1926, over which controversy arises are noted below. It was stipulated:

"That the return flow and drainage water from the Vale, Oregon, District may be turned into the canals of the Warmsprings Irrigation District in lieu of the stored water or natural · flow water to which the Warmsprings District would otherwise be entitled.

"The Warmsprings District will also accept in exchange for stored water to which it would otherwise be entitled, the return flow, drainage and waste water from the Vale project which reaches the Malheur River at points where the same can be diverted and used by the Warmsprings District."

It was further "agreed and understood, however, that no credit will be allowed to the Vale District for such return flow, drainage and waste water, except to the extent of the amount thereof which is turned into the ditches of the Warmsprings District, at such time of year and in such places as same can be used."

Although some other expressions in the document may have pertinency, these embody the crux of the dispute.

■ Textual construction of the contract indicates that the Vale Project was to receive credit for "return flow" whether this flow was surface water or underground water. In the provisions of the contract above quoted and in others the words "return flow, drainage and wastewater from the Vale District" are used interchangeably with the words "return flow". If "seepage" had been used instead of "drainage," the contract would be entirely plain. But "drainage" can be the result of a subsurface flow. This word is not inept to express the concept of water which has escaped from a reservoir by percolation and is drawn off when it appears again on the surface.[4] The use of the words "turned in the ditches of the Warmsprings District or reaches the Malheur River" in another portion of the contract indicates strongly that the parties had in contemplation not only water flowing on the surface but seepage, from the Vale Project. "Turned into" the ditches was used many more times in the contract than the word "reaches" but the basic idea seems to have been to protect the Warm-

[1] Jones v. Warmsprings Irrigation District, 162 Or. 186, 91 P.2d 542.

[2] Twin Falls Land & Water Co. v. Twin Falls Canal Co., D.C., 7 F.Supp. 238, affirmed 9 Cir., 79 F.2d 431.

[3] See Jones v. Warmsprings Irrigation District, supra, note 1.

[4] "In cutoff drainage, for draining seepy hillsides, tiles are placed along the hillside to intercept the seep water and prevent its reaching the bottom land." Merriam Webster Dictionary, "Drainage".

springs District in order that no credit should be given by it for any water which was not eventually made available for use by that District. Finally, the recital that the Chief Engineer of the Bureau of Reclamation after investigation was of opinion that the water supply was not sufficient for the proposed Vale Project "unless the Warmsprings District will agree to accept the divertible return flow from the Vale Project to the extent the same can be diverted and applied to beneficial use in the Warmsprings District and give storage credit to the Vale, Oregon District in return for such return flow from the Vale, Oregon District," indicates a necessity for obtaining credit for every particle of water which eventually was diverted onto the Warmsprings Project.

█ The question of consideration for the contract must be entertained next. The agreement was express and bilateral. There is no doubt that the United States owned the right to the water flowing away from the Vale Project on the surface of the ground. This water could be exchanged for other water in storage, provided the latter was subsequently applied to a beneficial use in accordance with the terms of the original appropriation. The water which escaped from the project by deep percolation was, according to the law of Oregon, of a public character[5] even against the United States.[6] There was no reason, however, why the Warmsprings District could not promise to pay back to the government three times as much stored water as the District obtained from the surface runoff alone, within limits of beneficial use and the terms of appropriation. Only in the event all the waters for which the United States received credit were of public character would the question of consideration or failure thereof arise. The value which a promisee places upon a promise may be fanciful in the eyes of others, but the consideration is not thereby destroyed.

If there exist any ambiguity in the language of the contract itself or any doubts as to the intention of the Warmsprings District to allow credit for the full amount of the water, sometime impounded by the Vale Project, whether such water may have become of public character before diversion onto the Warmsprings Project, such ambiguities and doubts may be dissolved by an inquiry into the history of the inception, construction and development of the Vale Project. This inquiry will also decide the question of the intention to include the "return flow" from the Agency Reservoir and the alleged abandonment by the United States.

█ After the contract in dispute had been signed the United States proceeded to construct the primary reservoir of the Vale Project and various other works. Subsequently the Agency Reservoir was built. The latter was brought to completion in 1935. The works completed cost approximately $4,000,000. In view of the fact that the Agency Reservoir was contemplated prior to the contract in question and specific provision made for the construction thereof, and that all these works are administered as a unit, there can be no question that the Agency Reservoir is an integral part of the Vale Project within the contemplation of the parties to the contract in suit. It is true that this reservoir was eliminated from the plans before the instant contract was signed, but it always remained in the contemplation of everyone. The Warmsprings Irrigation District was vitally interested in obtaining this totally new body of water in the arid country and selling half of the storage space in its reservoir, therefore, the contract to pay the United States for water produced by the latter does not seem unfair.

The State of Oregon as well as the Warmsprings District was concerned with the construction of the Vale Project. A tripartite agreement was entered August

---

[5] Oregon Compiled Laws Anno. Section 116-401; Vaughan v. Kolb, 130 Or. 506, 514, 280 P. 518; Jones v. Warmsprings Irrigation District, 162 Or. 186, 91 P.2d 542; Brosnan v. Boggs, 101 Or. 472, 476, 198 P. 890; See Ryan v. Quinlan, 45 Mont. 521, 124 P. 512.

[6] See Ickes v. Fox, 300 U.S. 82, 94, 95, 57 S.Ct. 412, 81 L.Ed. 525. If the case of Ide v. United States, 263 U.S. 497, 44 S.Ct. 182, 68 L.Ed. 407, conflicts, still the law of water enunciated by the Supreme Court of Oregon prevails. See California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356. The municipal law of Idaho under which Griffiths v. Cole, D.C., 264 F. 369, United States v. Haga, D.C., 276 F. 41, and Ide v. United States, supra, were decided might be different from that adopted in Oregon.

26, 1922, between these two entities and the federal government whereby at joint expense of all an investigation of the proposed project was to be made. The officials of the Reclamation Bureau, as the contract in question recites, were in this acting under the terms of a statute requiring information as to feasibility of any new project with reference, among other features, to "the water supply",[7] but the Warmsprings District apparently was impelled to contribute to this research by an enlightened self-interest. The result of this investigation was the opinion referred to in the contract in controversy, that the Vale Project was not feasible as to water supply, unless credit could be obtained for return flow. It was specifically pointed out in an intrabureau report before the making of the contract that there was danger that the "return flow" would become of public character under the laws of Oregon and suggested not only construction of the Agency Reservoir but specifically an agreement with the Warmsprings District as to credit for "return flow", or a reduction of the limits of the proposed project. The whole tenor of the letter is that "return flow" includes seepage as well as surface water.[8] In the light of such conditions the contract in question was executed on April 30, 1926. In October of the same year the United States by contract with the Warmsprings District purchased one-half of the storage space in the reservoir of that District, a transaction which was expressly conditional upon obtaining credit for the return flow according to contract of April 30, 1926. On October 22, 1926, also the United States entered a contract with the Vale District for the construction of the Vale Project, including a proviso for the future erection of the Agency Reservoir at the discretion of the Secretary of the Interior. This contract was placed on the public records of Malheur County in which the project was located.

The United States upon December 31, 1926, entered into a tripartite contract with Malheur County and the State of Oregon for surveys of the region during the construction, and this contract contains the following significant recitals: "3. Whereas, additional investigations are required to determine the amount and distribution throughout the year of losses and gains in Malheur River, together with its natural and artificial tributaries, under present conditions of operation, for the purpose of determining changes therein when the Vale project, Oregon, shall have been constructed and placed in operation, in order that said project may receive full credit for any additional waters which shall enter Malheur River and become divertible for irrigation or power purposes, or which shall enter natural or artificial channels from which such waters may be diverted for the use of the Warmsprings Irrigation District or other appropriators from the Malheur River and its tributaries, in return for the use of which by other appropriators the Vale project, Oregon, by contract between the United States and the Warmsprings Irrigation District, dated April 30, 1926, shall be permitted to divert an equal amount of natural flow water, or receive credit in the Warmsprings reservoir of any storage belonging to the Warmsprings Irrigation District."

This constitutes a contemporaneous construction by the United States and the State of Oregon of the terms of the contract in suit. It is now contended that the Water Department of the State of Oregon did not keep records sufficient to now determine the seepage. However, there is an important letter construing the contract which was written October 14, 1935, by the State Engineer of Oregon to the Watermaster in charge of this area. An excerpt shows the intention as follows: "Your attention is also called to the contract between the Warmsprings Irrigation District and the Department of the Interior whereby certain credit is to be given to the lands in the Vale-Oregon Irrigation District for return seepage. It is suggested that, so far as means will permit, you keep a careful record of this seepage water, and the water which can be beneficially used by the Warmsprings Irrigation District be

---

[7] 43 Stat. 702, 43 U.S.C.A. § 412. See, also, Reclamation Laws, 32 Stat. 388, as amended, as construed in Swigart v. Baker, 229 U.S. 187, 33 S.Ct. 645, 57 L. Ed. 1143.

[8] "Determination and regulation of project return flow may be rather difficult under conditions existing on the Malheur River and credit can probably be better obtained for it by negotiation with the Warmsprings District than in reliance on processes of law." Letter April 23, 1926, Engineer E. B. Debler to Chief Engineer—Subject: Water Supply—Vale Project, Oregon.

charged to them and credit allowed the Vale-Oregon Irrigation District in accordance with the contract."

The Warmsprings Irrigation District in pleadings filed in the state courts apparently took the position that "seepage" was to be credited to the Vale Project. The court did not rule upon the question[9] but the interpretation of the District is significant. Here, it seems, lies the key to the present case; the Oregon Supreme Court ruled that the seepage from the Warmsprings Project is of public character and that waste water thereof was abandoned. The Warmsprings District apparently then decided that the seepage water from the Vale Project was not property of the United States, and the District was no longer bound to exchange storage water therefor. But the District had already bound itself by the contract in suit.

■ Although it is claimed that no credit has been allowed during the years for the seepage water and measurements were not made upon that theory by the State Engineer the evidence seems to indicate that the officers of the United States never had any intention of relinquishment of the claim. Abandonment of a water right is not involved here but abandonment of a property right under a contract. Such action can only be taken by Congress. No estoppel or laches run against the sovereign in relation to property rights.[10] In this connection it should be noted that until 1936 not enough land had been brought under water in the Vale Project to make either the question of return flow or credit for seepage losses important. Specifically the seepage losses of the Agency Reservoir were not then in question because completion thereof was delayed until that year.

The language of the contract coincides with the subsequent construction by the parties and with the situation of all concerned immediately prior to its execution. The declaration on this feature will be in accordance with the contentions of plaintiff.

■ The court finds no basis for intervention of the State of Oregon and dismisses the petition thereof.

The supplemental questions regarding the time at which the credit shall be given and adjustments be made by the Warmsprings District to the Vale Project, and the question what waters constitute "usable return flow" to the Warmsprings Irrigation District, cannot be determined by construction of the wording of the contracts alone. At this time the court makes no finding thereon.

Findings and judgment may be submitted.

---

[9] Jones v. Warmsprings Irrigation District, 162 Or. 186, 91 P.2d 542.

[10] Utah Power & Light Co. v. United States, 243 U.S. 389, 402, 37 S.Ct. 387, 61 L.Ed. 791.