Argued at Pendleton May 5, affirmed July 3, petition for
rehearing denied August 6, 1975

# WIDNER ELECTRIC & INDUSTRIAL, INC.,
## *Appellant, v.* LEE, *Respondent.*
### 537 P2d 527

*Robert W. Collins,* Pendleton, argued the cause and filed briefs for appellant.

*Lawrence B. Rew,* of Corey, Byler & Rew, Pendleton, argued the cause and filed a brief for respondent.

BRYSON, J.

Plaintiff brought this action to recover the sum due on an account for the repair of a water pump which it had previously sold to defendant. Defendant filed his second amended answer, generally denying the allegations in plaintiff's complaint and affir-

matively alleging a separate defense and counterclaim. On May 14, 1974, the day trial began, plaintiff filed a demurrer to defendant's separate affirmative defense and counterclaim and its reply which included a general denial and affirmative defense to the defendant's counterclaim.

The case was tried to a jury and after both parties rested, plaintiff moved for a directed verdict on its complaint and then, for the first time, presented its demurrer to the court. The court denied plaintiff's demurrer and its motion for a directed verdict. The jury returned a verdict against the plaintiff and in favor of defèndant on his counterclaim, and the court entered judgment accordingly. Plaintiff appeals.

Plaintiff first contends that the court erred in denying plaintiff's demurrer to defendant's second amended answer and counterclaim. Defendant's further and separate defense alleged in part as follows:

"V

"Thereafter, defendant engaged plaintiff to and plaintiff did agree to repair defendant's pump and motor. In June, 1974 [1973], plaintiff returned the pump and motor to defendant's water well, representing that it was in proper repair and capable of pumping from defendant's water well the 600 gallons per minute needed by defendant to irrigate defendant's land adjacent to the water well.

"VI

"After reinstallation of the water well pump and equipment in June, 1973, by plaintiff in defendant's well, the equipment failed to operate properly in that it would pump less than 200 gallons per minute from the water well.

"VII

"Immediately, upon defendant attempting to

operate the pump after reinstallation by plaintiff, and defendant finding that the pump would not operate properly, the defendant contacted plaintiff and demanded that the pump be repaired properly. Plaintiff failed and refused to repair the pump after several notifications by defendant to plaintiff.

"VIII

"Thereafter, defendant had the water well pump and equipment removed from the water well by third parties and it was discovered that the pump and equipment failed to operate properly when reinstalled after repair by plaintiff because:

"1. The pump which plaintiff had represented at the time of the sale to defendant as a 30 horsepower pump was in fact only an 18 horsepower pump.

"2. The repair work that was done by plaintiff was of such poor quality that it would not pump the 600 gallons per minute as needed by the defendant.

"IX

"As a result of the failure by plaintiff both in the sale and the repair of the water well pump and related equipment, the motor and the repair work were of no value to the defendant."

Defendant's counterclaim alleged as follows:

"I

"Defendant re-alleges Paragraphs I, II, III, IV, V of his first further answer and defense.

"II

"When the pump and motor were reinstalled in June 1973 by plaintiff, the plaintiff knew or should have known that it was critical to defendant's crop that the pump operate properly.

"III

"Upon removal of the pump and motor by third parties from the water well of the defendant after reinstallation by plaintiff, it was necessary to rewind the motor to raise its horsepower capacity to 30 horsepower and to completely repair the pumping mechanism so that it would act as a pump of water from the well.

"IV

"As a result of plaintiff's failure at the time of the sale and at the time it agreed to repair defendant's motor and pump, defendant's 1973 wheat crop did not have adequate water and his alfalfa seed crop planted in the spring of 1973 did not have adequate water. The cost of repairing the motor to bring it to 30 horsepower was $550.00. The damage to defendant's crops was the sum of $20,000.00."

The affirmative defense in plaintiff's reply alleged in part:

"V

"That at defendant's urging, plaintiff did endeavor to repair the water pump so as to make it operative in accordance with defendant's request, and did not do any work on said electric motor as a result of defendant's specific instructions not to work thereon.

"VI

"That any damage resulting after the reinstallation to said pump, was a result of the sand in said well and defendant's refusal to permit further work to be done on the electric motor."

The defendant's counterclaim demanded judgment in the sum of $20,550. The jury returned a general verdict in favor of defendant in the amount of $6,500.

██ The pleadings were in effect challenged for the first time after the case was tried and both parties

rested. Under these circumstances, we are committed to a liberal construction of the pleadings so that the defense and counterclaim will be upheld, if possible. *See Fulton Ins. v. White Motor Corp.,* 261 Or 206, 214, 493 P2d 138 (1972); *Hamilton v. Johnson,* 137 Wash 92, 241 P 672, 673 (1925); ORS 16.120. When the plaintiff pleads over by filing a reply with an affirmative defense to the counterclaim, the counterclaim is entitled to every reasonable intendment. *Winters v. Bisaillon,* 153 Or 509, 515, 57 P2d 1095 (1936).

Plaintiff contends that "the affirmative defense does not allege that defendant relied upon any warranty" and that "there was no allegation of a breach of warranty in the counterclaim." Plaintiff relies upon *Abilene Natl. Bank v. Nodine,* 26 Or 53, 37 P 47 (1894), which states:

"* * * It is elementary law that unless the purchaser of personal property relied and acted upon the statement or representation of the seller as to the quality or condition of the thing sold, and was thereby induced to make the purchase, he cannot maintain an action for a breach of warranty * * *"

and that it is necessary

"* * * to allege that he relied upon the warranty and was thereby deceived * * *." 26 Or at 54-55.

■ The defendant's pleadings are not artfully drawn and include allegations of the original sale of the water pump and motor combination as well as the failure of the plaintiff to properly repair the pump, which plaintiff had agreed to do some 30 days after the original sale. However, the counterclaim does allege that defendant engaged plaintiff to repair the pump and motor, that plaintiff agreed to make the repairs, and that the repairs were not properly per-

formed, requiring defendant to have a third party "completely repair the pumping mechanism so that it would act as a pump of water from the well." The plaintiff did not file a motion requiring the defendant to make his pleadings more definite and certain. We have held that pleadings are not fatally defective merely because they are not artfully drawn. *Parker v. Faust,* 222 Or 526, 532, 353 P2d 550 (1960). In *Investors Ins. Corp. v. Dietz,* 264 Or 164, 504 P2d 742 (1972), it was contended that the complaint did not state a cause of action. We held:

> "* * * The complaint was clearly sufficient to apprise the defendant of what he must meet both as to the pleadings and the evidence. Lyden v. Goldberg, 260 Or 301, 490 P2d 181 (1971); Perkins v. Standard Oil Co., 235 Or 7, 383 P2d 107, 383 P2d 1002 (1963) * * *." 264 Or at 167.

We have examined all of the evidence and there is lengthy testimony by experts on both sides as to whether the pump and motor were properly repaired by plaintiff, and it appears that the case was tried to a large extent on this basis.

We conclude that the counterclaim, liberally construed, adequately apprises plaintiff, without prejudice, of defendant's claim that the pump and motor were improperly repaired, thereby causing the pump to fail with resulting damages to defendant's crops. This is also a defense to plaintiff's action to recover the sum due for the repair of the pump.

As a general rule, where parties to a bilateral contract dispute the performance rendered by one party, the law is quite clear that a material breach by one party may lead to a discharge of the other's corresponding duty—in this case, the defendant's duty to pay for repairs improperly performed. *Wasserburger v. Amer. Sci. Chem.,* 267 Or 77, 82, 514 P2d

1097 (1973). *See also* Annot., 44 ALR 824; 2 Restatement of Contracts 750, § 397.

■ The plaintiff also contends that the court erred in denying its motion for directed verdict on its complaint, arguing, as heretofore set forth, that the defendant had not pleaded or proved a breach of warranty. For the above reasons, we find no error in this respect. The conflicting testimony offered by both parties to support their contentions made the matter a jury question.

■ Finally, the plaintiff claims the court "erred in failing to sustain objection" to the following questions put to witness McGillis and the answers given:

"Q (By MR. REW:) Can you tell or can you contract now for the sale of alfalfa seed to be harvested in the fall of 1974?

"MR. COLLINS: Now, your Honor . . .

"THE WITNESS: Yes.

"MR. COLLINS: Excuse me, counsel. I didn't mean to interrupt. Are you through?

"MR. REW: Yes. I am through with the question.

"MR. COLLINS: We do have an objection to any testimony in regard to the price of Alfalfa seed at this time that might be contemplated from the 1974 crop due to the rule of damages that the succeeding year with this type of crop is not determinitive [sic] in regard to the measure of damages.

"* * * * *

"MR. REW: In other words, we are talking about what the price would have been for that crop in the summer of 1973?

"THE COURT: I think that would be proper.

"MR. REW: Fine. Thank you, Your Honor.

"Q (By MR. REW:) Mr. McGillis, was it possible to contract for the sale of Alfalfa seed that

would have been produced in 1974 in the summer of 1973?

"A   Yes. And may I explain?

"Q   Yes. Please do.

"A   It would be possible to contract with a grower if he were willing to sell . . .

"* * * * *.

"Q   All right. In the summer of 1973 what would the value have been for a pound of [alfalfa] seed to be grown in the fall of 1974?

"MR. COLLINS: Your Honor, we still have the objection on the grounds that it is not the proper measure of damages.

"THE COURT: Very well. Mr. Collins, the objection will be overruled. You may answer.

"* * * * *.

"THE WITNESS: Well, would you restate the question.

"Q   (By MR. REW:) Okay. I am asking if you contracted in the fall of . . . excuse me, in the summer of 1973 for production of your 1974 alfalfa seed crop, what would have been the value or the contract price at that time?

"A   I believe the price range was $60 per hundred weight.

"Q   Okay. Was that something per pound?

"A   Yes. That would be sixty cents per pound."; and the following questions put to defendant Lee and the answers given:

"Q   (By MR. REW:)   Okay. This would have been a second year crop in the fall of 1974?

"A   Yes.

"Q   Okay. What has been the average yields in the area for second year [alfalfa] seed crops?

"MR. COLLINS: We have the same objection, Your Honor, on the ground this is a perennial crop

and the second year after the breach occurred would not be applicable.

"\* \* \* \* \*.

"THE COURT: Well, the objection will be overruled, then.

"THE WITNESS: I can answer that?

"Q (By MR. REW:) Yes.

"A Approximately a thousand pounds."

The plaintiff argues that the defendant did not "endeavor to establish the value of the 1973 crop of alfalfa seed" and that "[t]he correct measure [of damages] was the amount of the loss to the 1973 crop, plus damage to the freehold, if any." The defendant does not claim damages to the freehold. The plaintiff quite frankly cites 21 Am Jur 2d, Crops § 80, as follows:

> " 'The question as to the measure of damages for injury to, or destruction of, a perennial crop is one presenting so many phases and conditions which may affect the result one way or another that it is practically impossible to formulate a general rule by which all cases may be governed. \* \* \*.' "

In *Walter v. Echanis*, 163 Or 148, 150-51, 95 P2d 979 (1939) (an action for the destruction of grass and other herbage and pasturage), this court held:

> "There is much diversity of opinion among the courts as to the measure of damages to be applied for the injury or destruction of growing crops. See numerous cases in notes 23 L. R. A. (N. S.) 310; 37 L. R. A. (N. S.) 976; 49 L. R. A. (N. S.) 415; 15 American Jurisprudence 260. The difficulty lies, however, not so much in the statement of the rule of damages as in determining the kind of evidence to be admitted to show the damage sustained. We think, however, that the rule is well settled in this state. There is no need of encumbering the

reports by a review of the numerous authorities in other jurisdictions.

"In *Pacific Livestock Company v. Murray,* 45 Or. 103, 76 P. 1079—a sheep trespass case—the court said:

" 'The measure of damages was the reasonable value to the plaintiff of the grass or pasturage eaten or destroyed by defendant's sheep, together with the injury, if any, to the freehold.'

"*Laur et al. v. Walla Walla Irrigation Co. et al.,* 118 Or. 520, 247 P. 753, involved damages to a growing crop of alfalfa caused by wrongful interference with a water right. The court held that it was proper, in order to prove damages, to 'show the probable amount of alfalfa hay that the crop would have yielded had it been allowed to mature without being injured, judging from its condition and appearance at the time of its injury, as compared with other crops, in other years, under like conditions, or in the immediate vicinity, together with the value of the crop at the market season, deducting therefrom the necessary cost of cultivation, harvesting and marketing * * *', citing numerous authorities in support thereof. Also, to the same effect, see *Whetstone v. Rogue River Valley Canal Co.,* 133 Or. 121, 285 P. 229, 288 P. 406." 163 Or at 150-51.

In *Cross et ux v. Harris,* 230 Or 398, 370 P2d 703 (1962) (an action to recover damages for partial destruction of growing crops), we held:

"* * * Considerable latitude should be allowed in the admission of evidence to prove the value of a crop which has been injured or destroyed. * * *" 230 Or at 408.

McCormick, Damages § 126 (Hornbook Series 1935), discussing damage to crops, states, at page 487:

"* * * Accordingly, the decisions usually sanction the practice of admitting proof, where the growing crop is destroyed, of the probable yield

and value of the crop, when finally harvested and marketed at maturity, and of the cost of the further care and cultivation, harvesting, and marketing, as evidence of the actual realizable value of the growing crop when destroyed. It is a short step from this to say directly, as many cases do, that the measure of damages is what the crop when harvested would finally have brought, less the prospective cost of cultivation, harvesting, and marketing. * * *" (Footnotes omitted.)

Affirmed.