Argued April 29, affirmed as modified September 3, 1976

WOOD, *Respondent,*
*v.*
WOODCOCK, *Appellant.*
554 P2d 151

*Patrick G. Huycke,* Medford, argued the cause for appellant. With him on the briefs were Van Dyke, DuBay, Robertson & Hilts, P.C., Medford.

*Oscar R. Nealy,* Grants Pass, argued the cause for respondent. On the brief were Donald H. Coulter, and Myrick, Coulter, Seagraves & Nealy, Grants Pass.

BRYSON, J.

**BRYSON, J.**

Plaintiff brought this suit to enjoin defendant, an adjoining landowner, from interfering with "spring and seepage" water on which plaintiff claimed priority pursuant to a water permit issued by the state engineer. Defendant filed a general denial and a counterclaim for trespass and to establish a prescriptive easement over plaintiff's land.

The trial court entered a decree as follows:

"1. The defendant is hereby permanently and forever enjoined from entering on to the plaintiff's property other than along the easement right of way of the Watts Topping Ditch, and is forever and permanently enjoined from using the Wilson Box located on the plaintiff's property to divert and convey water therefrom across the plaintiff's property to the property of the defendant;

"2. That defendant is permanently and forever enjoined from interfering in any manner with the plaintiff's use and enjoyment of the spring and seepage water on the plaintiff's property around the Wilson Box and immediately northeasterly of the Watts Topping Ditch while said ditch transverses the plaintiff's property; * * *

"* * * * *."

and also entered judgment against plaintiff on defendant's counterclaim for trespass in the sum of $500. The defendant appeals.

Watts-Topping Ditch Company owns the ditch which diverts water from Williams Creek for irrigation of land in this area.

The drawing on the following page illustrates the area in controversy.

[ 51 ]

Plaintiff and defendant are members of the ditch company and are entitled to use designated amounts of water from the ditch for irrigation. For a number of years water had been accumulating on the northeast corner of plaintiff's property where a pond is presently situated. Several witnesses described this area as being a swamp or marsh. The evidence shows that the accumulation is largely the result of natural seepage, drainage and "waste" water from the Watts-Topping Ditch in the area of the Wilson (diversion) Box.

■ The ditch terminates on defendant's property and, being "tail-end-Charlie," defendant is entitled to impound and use the water not previously appropriated from the ditch by prior authorized users.

Water released from the Wilson Box flows naturally in a general northeasterly direction for some 20 feet over plaintiff's land and then onto defendant's property, down through a wash, under John Flower's Lane and into a ditch from which defendant can irrigate. This water also flows naturally and easterly along John Flower's Lane and back onto plaintiff's land where plaintiff constructed a pond to capture it.

In September 1969 plaintiff filed an application for "spring and seepage" water and received a water permit from the state engineer to appropriate such water to irrigate 10 acres. This is the water which had been accumulating on the northeast corner of plaintiff's property. Shortly thereafter plaintiff cleared the area, built a pond to accumulate the seepage water and installed equipment to pump the water out of the pond and onto his land.

During the same year defendant repaired an existing culvert under John Flower's Lane and installed a steel pipe to channel the water flowing down the hill from the Wilson Box area into an irrigation ditch for his use. During the summer of 1972 plaintiff, believing that defendant was misappropriating plaintiff's water, entered onto defendant's land and dug a small ditch by

hand to divert the water away from defendant's steel pipe and down to plaintiff's pond. Later, in the early part of 1973, defendant widened John Flower's Lane near the steel pipe and filled plaintiff's hand dug ditch with gravel.

Plaintiff then commenced this suit and obtained a temporary restraining order against defendant. After the restraining order had been granted, plaintiff again entered onto defendant's land with a back hoe, blocked defendant's steel pipe and dug a ditch over defendant's land to draw the disputed water down to his pond.

Defendant contends that the trial court "erred in failing to determine that the defendant had established a prescriptive easement across plaintiff's land [from the Wilson Box to defendant's property —see drawing] for the transportation of water."

One of plaintiff's predecessors in title, Clifford E. Wilson, and his father built the "Wilson Box" to divert water for irrigating their land situated east and west of Watergap Road. He testified:

"Q There has been testimony that there is presently a concrete structure around the box itself, meaning to compose the box and for the boards to fit in. Do you know how long that's been the case?

"A Not exactly, but I think it was put in in the early fifties.

"Q Can you tell us who built that box as it now exists?

"A I built the box, along with help with some neighbors that was working together.

"* * * * *.

"Q Was the Defendant, Mr. Woodcock, involved in any way in the structure or building of that box?

"A No sir.

"Q Was his father involved in any way in building that box?

"A No.

"* * * * *.

"Q Up until 1970 or 1971, as you are stating the date to be, when you no longer used the Wilson box, during the

years prior to that did Mr. Woodcock use your box to irrigate the field adjacent to Watergap Road?

"A He did some, and before the cement box was put in he used it some.

"Q How about after the cement box was put in?

"A There was for a period of time there that he didn't use it at all.

"* * * * *.

"Q Did you at any meetings of the Watts-Topping Ditch give or delegate to Mr. Woodcock your right to that box on Watts-Topping ditch?

"A Not the box. I gave him the right to my water that was in the ditch when I wasn't using it.* * *.

"* * * * *.

"Q Did Mr. Woodcock ask you if he could use that box to irrigate his lower field adjacent to Watergap Road at any time?

"A I don't remember if it was ever discussed.

"* * * * *.

"Q I see. Now isn't it a fact, though, that the box has been used by Lyle Woodcock since about 1962 during the summer months and during the irrigation season?

"A Part of the time.

"Q By part of the time you mean during part of the summer months, not during the early part?

"A Not every year."

Watts-Topping Ditch terminates in defendant's pond near his house which is some distance from the nine acres of defendant situated in the southeast corner of his property adjoining plaintiff's property. It is this nine acres that defendant desires to irrigate by opening the Wilson Box and allowing water to flow across plaintiff's land down to the acreage. The evidence shows that defendant could irrigate these nine acres from one of two ponds (other than plaintiff's pond as shown on the preceding diagram) located on his property although it is more expensive and requires running pipe a further distance.

The evidence also shows that another neighbor, Wallace Palmer, as well as Clifford E. Wilson, has permissively diverted water over plaintiff's land.

[ 55 ]

Nevertheless, defendant contends he has a right to use the Wilson Box and a prescriptive right from the Wilson Box over plaintiff's land to his nine acres.

■  Easements by prescription are not favored by the law, 2 Thompson, Real Property § 335, at 154 (1961). Courts have held that uses of unenclosed or unemployed lands tend to be permissive in nature and that the claimant must affirmatively prove the adverse character of his behavior in such instances. 3 Powell, The Law of Real Property ¶ 413, at 481-84 (1975); Annot., 170 ALR 776, 820-23.

In 2 Thompson, *supra* at 154, the author states that the modern tendency is to restrict the acquisition of rights of way by prescription which were granted as a neighborly act or out of courtesy. *See also Thompson v. Scott,* 270 Or 542, 551, 528 P2d 509 (1974).

■  The evidence does not support defendant's allegation that he has "continuously and adversely" used plaintiff's land for the required purpose "for more than ten years last past." The evidence adduced by defendant to establish his prescriptive claim to use plaintiff's land was sparse and ambiguous.

> "Something more than this must be required before an owner's property interest is forfeited and transferred to another whose claim rests solely on the use of the owner's property." *Thompson v. Scott, supra* at 552.

We concluded from the facts of this case that defendant did not acquire a prescriptive easement over plaintiff's land.

Defendant next contends that the court "erred in granting an injunction which in effect bars the defendant from using the Wilson box in any manner whatsoever and in determining that defendant's right to use the Wilson box terminated when the prior user and owner of the box transferred his point of diversion to another ditch." In this connection defendant also contends that the court erred in determining that the

water used by plaintiff for his pond was abandoned waste rather than water intentionally diverted by the defendant for irrigation purposes.

The trial court's decree previously set forth provides that defendant is "permanently enjoined from using the Wilson Box located on the plaintiff's property to divert and convey water therefrom across the plaintiff's property * * *." We do not interpret this to mean that the defendant cannot maintain the Wilson Box to improve his rightful flow of water in the Watts-Topping Ditch to his pond. The trial court concluded, and we reach the same conclusion, that defendant may not use the Wilson Box for the purpose of diverting water across plaintiff's land.

We have reviewed all of the testimony and there are portions which we find to be not conclusive. This includes testimony offered by both plaintiff and defendant. For instance, the plaintiff contended in his application to the state engineer that this water accumulated from "spring and seepage" water. At the time of trial it had not been determined if there was in fact a spring adding water to a natural seepage of water from the Watts-Topping Ditch. Mr. Vander Griend, the deputy water master for this district handling water emanating from the Williams Creek area, testified:

"Q Nobody has ever determined that there is a spring in there, have they?

"A No, they have not.

"Q In fact, it's pretty much been ruled out that there is any spring in it?

"A It hasn't been ruled on yet. It is still in permit form, and no final decision as to the source of supply has been determined. This is something that has to be done at the time the final survey is made by a survey crew out of the State Engineer's office, and they will make a determination and find out the water rights on their findings."

Also, there is testimony that the Watts-Topping Ditch has an easement from all property owners of about 20 feet which includes the ditch and a few feet on which to

operate equipment for maintenance of the ditch. However, this testimony is questioned and controverted by other testimony and the easements were not introduced in evidence. Mr. Wallace Palmer, chairman of the Watts-Topping Ditch, an Oregon corporation, testified:

"Q  A 20 foot easement?

"A  I'll qualify that. I jogged my memory on that. It would have to be looked up legally.

"Q  Do you know where that corporation paper could be?

"A  I imagine you could find a copy of it with the corporation commissioner, I guess would be the most logical place to find one."

He also testified that he couldn't say that there was a 20-foot easement, but "I'll say there is an easement."

The defendant Woodcock testified that he had not been getting his allotted share of water from the Watts-Topping Ditch and that he approached the water master to enforce the water rights he had obtained through his father. After this, and beginning in 1973, he had an abundance of water running through the ditch and into his pond at the termination point. Mr. Woodcock testified:

"Q  What was your water situation as far as your water rights out of Watts-Topping last year? [1973]

"A  Excellent.

"* * * * *.

"A  The Watermaster realized it was a bad year, and he got busy and he honored the old rights and we had water. The old rights were really standing out last year.

"Q  You are claiming you had a pond full of water, and you just didn't want to disturb your land to get it to that nice alfalfa hay field, the nine acre parcel last year, is that what you are maintaining today, Mr. Woodcock?

"A  Yes."

The defendant may not trespass upon the plaintiff's property to maintain the Wilson Box or the Watts-Topping Ditch in order to increase his supply of water rightfully due him under his water rights. *Minton v. Coast Property Corporation,* 151 Or 208, 217, 46 P2d

1029 (1935). By the same token, the plaintiff has no right to trespass upon the defendant's property in order to capture or improve the flow of water into his pond. The testimony indicates that each of the members of the Watts-Topping Ditch has a duty or responsibility to help maintain the ditch if the easement is sufficient. If the easement of the Watts-Topping Ditch Company is of sufficient width, the defendant may maintain the ditch and the Wilson Box in order to insure that he will receive his full allotment of water from the ditch.

■ Defendant also contends that the court erred in finding "that the water leakage and seepage in and about the Wilson Box reverted to the state of Oregon." In *Jones v. Warmsprings Irrigation Dist.,* 162 Or 186, 196, 91 P2d 542 (1939) this court quoted with approval the following language from 1 Wiel on Water Rights (3d Ed.):

> " 'The water taken into an artificial structure and reduced to possession is private property *during the period of possession.* When possession of the actual water or *corpus* has been relinquished or lost, by overflow or discharge after use, property in it ceases; the water becomes again nobody's property and re-enters the negative community, or "belongs to the public," just as it was before being taken into the ditch. It has no earmarks to enable its former possessor to follow it and say it is his. The specific water so discharged or escaped is abandoned; not an abandonment of a water-right, but an abandonment of specific portions of water, viz., the very particles that are discharged or have escaped from control.' p.36, § 37." (Emphasis in original)

The evidence in this case shows that there is some natural seepage from any dirt water ditch and that this was true in the instant case. This allows the plaintiff to capture such water as he can from his own property but it does not allow him to trespass upon the defendant's property for this purpose.

Finally the defendant contends that the trial court erred in the way of compensation for plaintiff's trespass upon his property. The defendant's amended complaint demanded damages for the cost of replanting his nine-

acre field and for loss of his 1973 grass alfalfa crop by reason of the plaintiff wrongfully blocking the flow of water through the steel pipe and into the irrigation ditch. Defendant also demanded punitive damages. The trial court found that plaintiff had trespassed on defendant's property on two occasions and that defendant suffered damages in the amount of $500. The trial court did not indicate in its findings which items were covered by this award.

At the time of argument the defendant conceded that he could not recover punitive or exemplary damages in an equitable proceeding. *See Pedah Company v. Hunt,* 265 Or 433, 436, 509 P2d 1197 (1973). In *Widner Electric v. Lee,* 272 Or 445, 537 P2d 527 (1975), we reviewed our prior decisions on damages arising out of injuries to growing crops. Generally, the measure of damages is the reasonable value of the crop which was destroyed, less expenses waived, plus the injury to the freehold if any. *See also* McCormick, Law of Damages § 126 (1935); 21 Am Jur 2d, Crops § 80. From our review of the record, defendant failed to introduce evidence of his expenses in cultivation and the cost of harvesting in the 1973 season. Therefore, defendant failed to meet his required burden of proof. There is evidence that the defendant did expend at least $500 in replanting his nine-acre field as it had dried out for lack of water caused by plaintiff's trespass onto defendant's property. We conclude that the defendant is entitled to damages in the sum of $500 against the plaintiff.

The decree of the trial court is affirmed as modified herein and remanded to the trial court for entry of a decree not inconsistent herewith.