Argued and submitted March 12; decision of Court of Appeals reversed, judgment of circuit court affirmed July 23, 2020

ALBANY & EASTERN RAILROAD COMPANY,
an Oregon corporation,
*Respondent on Review.*

*v.*

Michael MARTELL
and Cindy Martell, a married couple;
John Harcrow and Elaine Harcrow, a married couple;
Jeffrey Kaiser and Beverly Kaiser, a married couple;
Joanne Fagan, an individual;
Ray McMullen and Michelle McMullen, a married couple;
Jeremy Orr and Karen Orr, a married couple;
Richard Hutchins and Jill Hutchins, a married couple;
Laura Mithoug, an individual,
*Petitioners on Review.*

(CC 13CV00291) (CA A161921) (SC S066941)

469 P3d 748

Since at least 1942, defendants and their predecessors have accessed their residential properties using a private roadway that crossed railroad tracks and land owned by plaintiff, Albany & Eastern Railroad Company (AERC). The railroad crossing was long believed to be a public crossing. After determining that the crossing was actually private, plaintiff brought suit against defendants, seeking to quiet title in the disputed crossing and also alleging and seeking damages for trespass. Defendants asserted various affirmative defenses and counterclaims, including that they each had a prescriptive easement over the crossing because they and their predecessors had used the crossing openly, notoriously, and adversely to AERC and its predecessors for at least 10 continuous years. The trial court held the common-law presumption of adversity applied and also that the residents had proved, by clear and convincing evidence, actual adversity and the other elements required to establish a prescriptive easement. The Court of Appeals reversed, concluding that the trial court erred in concluding that the presumption of adversity applied, and held that there was no evidence that defendants' use of the crossing was adverse to plaintiff's interests. *Held*: Any subjective misunderstanding regarding the public or private nature of the crossing does not affect the application of the presumption of adversity, and plaintiff did not present evidence of permissive use or other facts that would rebut that presumption. The trial court correctly applied the presumption of adversity to the facts here and, therefore, defendants established a prescriptive easement to use the crossing to access their properties.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

En Banc

On review from the Court of Appeals.*

Dan Armstrong, Heilig Misfeldt &Armstrong, LLP, Corvallis, argued the cause and filed the briefs for the petitioners on review.

Martin E. Hansen, Francis Hansen & Martin, LLP, Bend, argued the cause and filed the brief for respondent on review. Also on the briefs was Christopher J. Manfredi, Bend.

BALMER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____
* Appeal from Linn County Circuit Court, David E. Delsman, Judge. 298 Or App 99, 445 P3d 319 (2019).

**BALMER, J.**

This case requires us to consider once again the circumstances in which one's use of another's property gives rise to a prescriptive easement. Following a bench trial, the trial court determined that the residents of a small neighborhood (or their predecessors) who since 1942 have used a railroad crossing on a private roadway to access their homes had established a prescriptive easement over the crossing. The Court of Appeals reversed, holding that the residents could not take advantage of the "presumption of adversity" long recognized by this court because their use of the crossing was not likely to put the landowner on notice of the adverse nature of the use. *Albany & Eastern Railroad Co. v. Martell*, 298 Or App 99, 108, 445 P3d 319 (2019). That court went on to consider whether, without the presumption, clear and convincing evidence at trial proved that the residents' use of the crossing had been adverse and held that it did not. *Id.* at 109. For the reasons set out below, we conclude that the presumption of adversity applied to the residents' claims and that no evidence rebutted that presumption. Accordingly, we reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

We take the facts from the trial court's findings and the record. In 1910, the owner of an approximately 75-acre parcel of land on the west side of the South Santiam River in rural Linn County divided the parcel into two parts, deeding the north parcel to his daughter, Murray, and the south parcel to his son. The owner's son sold his parcel to Sharinghousen in 1915.[1] A road that is now Highway 20 has long passed through the two adjoining parcels in a northwesterly direction. A private roadway allowed access to the two parcels from Highway 20. In 1928, Sharinghousen and Murray both sold strips of their property to the predecessor in interest of plaintiff Albany & Eastern Railroad Company (AERC) to enable the buyer to construct a railroad along the east side of, and parallel to, Highway 20. Murray's deed

---

[1] The trial court and the Court of Appeals appear to have made a minor factual error in stating that Sharinghousen received his parcel from his father, the prior owner, in 1910. Documents in the record indicate that the prior owner deeded the land to his son, Strickler, and that Sharinghousen purchased the land from Strickler in 1915. The error is irrelevant to any issue in the case.

retained an easement at the location of the private road-way across the property she sold to the railroad that provided access to her property from Highway 20. The deed required the railroad to "construct and maintain a private grade crossing" for the private roadway across that land. Sharinghousen did not retain an easement, and his deed warranted that the property he transferred was free from all encumbrances. AERC's predecessor presumably laid the tracks for the railroad along the land purchased from Sharinghousen and Murray and, as required by the deed from Murray, established a crossing across the tracks at the location of the easement.

In 1942, Sharinghousen divided the part of his parcel that was east of the railroad into eight lots and created the Country Lane neighborhood, the current residents of which are the defendants here. By 1953, three of the lots were occupied, and all eight lots were occupied by 1963. The trial court found that, since 1942, the owners and residents of the Country Lane neighborhood "have regularly come and gone to and from their property across the railroad at the crossing located on the old Murray easement." The trial court also found that the only means of access to the Country Lane lots was the crossing at the Murray easement. Two early residents testified that access across the tracks was never restricted and that they did not feel like they were trespassing or that they needed the railroad's permission to cross the tracks. The trial court further found that "from at least 1953 the railroad treated the crossing as a public crossing," that the railroad always had maintained the crossing at its own expense, that at some point the railroad had installed crossbuck signs indicative of a public crossing, and that no "no trespassing" or "private crossing; access restricted" signs were ever installed.

AERC purchased the railroad in 2007 and the land underlying the tracks in 2012. After it purchased the land, AERC reviewed the property records and determined, according to the trial court, that "the old Murray easement/ Country Lane crossing did not provide deeded access to the Country Lane properties." AERC attempted to negotiate permits that would authorize use of the crossing by the

residents in exchange for a permit fee and an annual maintenance fee, but those efforts were unsuccessful. In 2012, AERC posted new signs labeling the crossing as private and prohibiting trespassing across the tracks.

AERC then filed this action seeking to quiet title in the disputed crossing and also alleging and seeking damages for trespass. AERC named as defendants the residents of the eight homes on Country Lane. The residents asserted various affirmative defenses and counterclaims, including that they each have a prescriptive easement over the crossing because they and their predecessors had used the crossing openly, notoriously, and adversely to AERC and its predecessors for at least 10 continuous years. The parties agreed that the residents had used the crossing for more than 10 years and that that use had been open, notorious, and continuous, and the only issue at trial was whether the use was "adverse or permissive." The trial court held that, based on the evidence at trial, the "presumption of adversity applies in this case," citing *Feldman et ux. v. Knapp et ux.*, 196 Or 453, 471, 250 P2d 92 (1952) ("[W]here a claimant has shown an open, visible, continuous, and unmolested use of land for the period of time sufficient to acquire an easement by adverse user, the use will be presumed to be under a claim of right."). Separately from the application of the presumption of adversity, the trial court found that the residents had proved, by clear and convincing evidence, actual adversity and the other elements required to establish a prescriptive easement.

The Court of Appeals, however, concluded that the trial court erred in following cases that allowed a "presumption of adversity" based on longstanding open and notorious use. The presumption did not apply, the court held, because "'the *nature of the land* or the relationship between the parties is such that the use of the owner's property *is not likely to put the owner on notice of the adverse nature* of the use.'" *Albany & Eastern Railroad Co.*, 298 Or App at 108 (quoting *Wels v. Hippe*, 360 Or 569, 579, 385 P3d 1028 (2016), *adh'd to as modified on recons*, 360 Or 807, 388 P3d 1103 (2017) (emphases in *Albany & Eastern Railroad Co.*)). The court then considered whether, in the absence of the presumption

of adversity, the residents had proved that "their use of the railroad crossing had been adverse or otherwise under a claim of right." *Albany & Eastern Railroad Co.*, 298 Or App at 109. The court held that "there was no evidence that defendants' use of the crossing in any way interfered with AERC's use of its property," *id.* at 110, and similarly rejected the claim that the insurance and maintenance costs AERC incurred because of the residents' use of the crossing demonstrated any interference with AERC's use. *Id.* On review, the parties reprise their arguments regarding what a claimant must show to establish a prescriptive easement over a landowner's property.

We begin with a brief review of the law of prescriptive easements and the presumptions that have developed to apply that law. The equitable doctrine of prescriptive easements evolved to accommodate—and, when they conflict, to resolve—two groups of important but competing interests. The first includes the owner's interest in controlling the use of his or her property. After all, as this court observed in *Wels*, "the doctrine permits one person to acquire an interest in land without paying the owner for it." 360 Or at 578. For that reason, courts often say that prescriptive easements are not favored by the law. *Id.* (citing *Wood v. Woodstock*, 276 Or 49, 56, 554 P2d 151 (1976)). But another important interest is that "established patterns of land possession and use should be protected," *Wels*, 360 Or at 577 (internal quotation marks and citation omitted), which a prescriptive easement does by "reward[ing] the long-time user of property[,] *** fulfill[ing] expectations fostered by long use, and *** conform[ing] titles to actual use of the property." *Restatement (Third) of Property (Servitudes)* § 2.17 comment c (2000). As we stated in *Wels*, however, "not just any use will suffice to establish a prescriptive easement." 360 Or at 577. Rather, the party asserting an easement "'must establish an open and notorious use of [the] land adverse to the rights of [the owner] for a continuous and uninterrupted period of ten years.'" *Id.* (quoting *Thompson v. Scott*, 270 Or 542, 546, 528 P2d 509 (1974)). A use is "adverse" if that use is "inconsistent with the owner's use of the property or if it is undertaken not in subordination to the rights of the owner"; moreover, "[u]se by permission is not adverse." *Wels*, 360 Or at 578-79.

Courts have long recognized the evidentiary difficulties of determining whether a longstanding use of land was initially adverse and have used presumptions to aid in that task:

> "The question whether a use was adverse, made pursuant to an implied servitude, or permissive, in the inception is often difficult to answer, particularly in cases of long-established uses where the original parties are not available to describe the circumstances of the initial use. Courts have developed a series of presumptions to assist in determining whether the use was permissive or prescriptive."

*Restatement* § 2.16 comment g.

Over 120 years ago, we held, "as a general proposition of law, that if there has been an uninterrupted user and enjoyment of an easement, in a particular way for more than ten years, it affords a * * * presumption of right in the party who shall have enjoyed it." *Coventon v. Seufert*, 23 Or 548, 550, 32 P 508 (1893); *see also Feldman*, 196 Or at 471 ("The prevailing rule is that where a claimant has shown an open, visible, continuous, and unmolested use of land for the period of time sufficient to acquire an easement by adverse user, the use will be presumed to be under a claim of right."). That general rule is consistent with the majority rule across the country:

> "The majority of American states apply a presumption that an unexplained, open or notorious use of land, continued for the prescriptive period, is adverse, or made pursuant to an implied servitude. *This presumption of prescriptive use gives effect to the idea that long-continued uses create expectations of entitlement and favors existing users over newcomers who would disrupt established neighborhood patterns of land use and access.*"

*Restatement* § 2.16 comment g (emphasis added).

As we discuss in greater detail below, however, the presumption may not apply in some circumstances, and, even where it does apply, it can be overcome by evidence that the use was not adverse. In *Wels*, we stated that the presumption of adversity based on open and notorious use for the prescriptive period "applies in ordinary cases, in which the person claiming the easement by prescription is

a stranger to the landowner; under such circumstances, it makes sense to assume that obvious use of the owner's property is adverse to his or her rights." 360 Or at 579. But we also described two situations in which the presumption does not apply: first, when "an owner supplies *permission* to use a road across the owner's property," *id.* (emphasis added), and, second, in "common road" cases, "when a claimant uses a road that the landowner constructed or that is of unknown origin," *id.* Those exceptions, too, are consistent with the majority of other jurisdictions, which hold that "particular fact situations overcome the presumption of prescriptive use, creating a counter-presumption that the initial use was permissive." *Restatement* § 2.16 comment g.

Here, the trial court concluded that the residents could rely on the presumption of adversity based on their and their predecessors' open and notorious use of the crossing since at least 1942 and because no evidence supported either the "permission" or "common road" exceptions that would overcome the presumption. The Court of Appeals, however, held that "the presumption is not as broadly applicable as the trial court understood it to be," *Albany & Eastern Railroad Co.*, 298 Or App at 108, and instead concluded, citing *Wels*, that the presumption did not apply because "the nature of the railroad crossing at issue here was such that defendants' use of that crossing was not likely to have put plaintiff on notice that the use was adverse." *Id.* We turn to a closer examination of the circumstances in which the presumption of adversity does or does not apply to determine whether the Court of Appeals erred in holding that it did not apply here.

An adverse use "is a use made without the consent of the landowner, or holder of the property interest used, and without other authorization." *Restatement* § 2.16 comment b. The Court of Appeals looked to our decision in *Wels*, where, as noted, we described the exceptions to the presumption of adversity. The first exception is where the landowner gives the user permission; in those circumstances, the use, by definition, cannot be adverse. Second, the "common road" exception recognizes that, when the landowner and the claimant (and perhaps other users) make use of a road that

was constructed by the landowner or is of unknown origin, "'it is more reasonable to assume that the use was pursuant to a friendly arrangement between neighbors rather than to assume that the user was making an adverse claim.'" *Wels*, 360 Or at 579-80 (quoting *Woods v. Hart*, 254 Or 434, 436, 458 P2d 945 (1969)).

The Court of Appeals did not disagree with the trial court's finding regarding permissive use, which was that "there is no evidence in the record that the railroad granted permission to the Country Lane residents to use the crossing." And the Court of Appeals also agreed with the trial court that the crossing was not a "common road," unlike the road at issue in *Wels*: "There is no indication that the crossing at issue here was built to benefit the railroad and, unlike the traditional common road cases, the defendants here are not incidental users of a roadway that was constructed by the railroad or is of unknown origin." *Albany & Eastern Railroad Co.*, 298 Or App at 109. Moreover, as noted, although the railroad constructed the "private grade crossing," as agreed in its deed from Murray, the private roadway itself that provided access to Highway 20 already existed in 1928 when the railroad acquired the property. No party argues that the "common road" exception applies here.

Instead of relying on those longstanding exceptions to the presumption of adversity, the Court of Appeals stated that it would apply "the court's rationale [in *Wels*] for those exceptions," which it took to be that "in some cases, even those involving strangers to the landowner, 'the *nature of the land* or the relationship between the parties is such that the use of the owner's property *is not likely to put the owner on notice of the adverse nature* of the use.'" *Id.* at 108 (quoting *Wels*, 360 Or at 579) (emphases in *Albany & Eastern Railroad Co.*). The court went on to hold that "the nature of the railroad crossing at issue here was such that defendants' use of that crossing was not likely to have put plaintiff on notice that the use was adverse." *Id.* It stated that the "trial court's express findings dictate that conclusion," and quoted the following from the trial court opinion:

> "'[I]t is clear that from at least 1953 the railroad treated the crossing as a public crossing. The railroad has always

maintained the crossing at its own expense. The railroad installed crossbuck signs indicative of a public crossing. There is no evidence that restrictive signs were installed such as "no trespassing" or "private crossing, access restricted." Beginning in 1970 the crossing was erroneously listed as a public crossing by the United States Department of Transportation.'"

*Id*. Thus, the Court of Appeals' conclusion that the "nature of the railroad crossing" was such that the use of the crossing by the residents was not likely to have put the railroad on notice that the residents' use was adverse turned solely on the railroad's mistake of historical fact that the crossing at the Murray easement was a "public crossing."

We disagree with the Court of Appeals' conclusion that the facts here preclude the application of the presumption of adversity; on the contrary, the facts found by the trial court fully support the trial court's holding that the presumption applies. We first consider those facts and then turn to the role, if any, of the mistaken belief that the crossing was public.

The record shows that the 1928 deed from Murray to AERC's predecessor required the railroad company to construct a "private grade crossing" across the tracks at the location of the existing road over which Murray retained an easement. The railroad company apparently built the crossing when it laid the tracks at around that time, as required by the deed. As noted, the crossing was a private crossing for Murray.

There is no evidence in the record as to whether Sharinghousen, as well as Murray, used the crossing once the railroad was built and before 1942, although no other road or crossing would have given him access to his land east of the railroad tracks. As discussed, the trial court found that "[s]ince the creation and development of the Country Lane neighborhood"—in 1942, when Sharinghousen created the development by dividing his property into eight lots—"residents have regularly come and gone to and from their property across the railroad at the crossing located on the old Murray easement." Nor is there any dispute that the railroad company and Sharinghousen were "strangers,"

rather than family members or neighbors who permitted each other to cross their land through a "friendly arrangement." *Woods*, 254 Or at 436.

The trial court also found that there was "no evidence in the record that the railroad granted permission to the Country Lane residents to use the crossing." The railroad never restricted the residents' access across the tracks or posted no-trespassing signs. The trial court found that the residents and their predecessors "didn't feel they were trespassing, nor did they feel they needed the railroad's permission to cross the tracks." Evidence in the record supports the residents' claim that Sharinghousen, the predecessor in interest of the properties that they now own, was using the crossing by 1942 and that he and the owners of the property who purchased lots from him after that date (and their successors) have used the crossing continuously ever since. That open, notorious, and continuous use for more than 10 years allows the residents to invoke the presumption that their use was adverse—that is, under a claim of right—to the landowner and thus to establish their right to prescriptive easements.[2] *Wels*, 360 Or at 577.

AERC argues, however, that because its predecessor mistakenly believed that the crossing was "public," the presumption of adversity cannot be invoked because the predecessor railroad could not have known that the residents' use was under a claim of right. Similarly, the Court of Appeals appears to have relied almost entirely on that fact in holding that the presumption of adversity did not

_____

[2] Because the parties agreed that the residents' use of the crossing was "continuous" for decades, neither they nor the lower courts discussed the issue of whether use for the required time period can be established by adding together, or "tacking," periods of ownership by different residents. For present purposes, it is enough to note that Oregon allows use by successive owners to be added together to meet the statutory time requirement. *See Evans v. Hogue*, 296 Or 745, 755, 681 P2d 1133 (1984) ("The period of [adverse] possession may be completed by one possessor for the full statutory period or by a series of possessors in privity with each other under the doctrine of tacking."); *Feldman*, 196 Or at 474 ("tacking" doctrine applies in prescriptive easement cases; "if necessary, the adverse users of successive owners in privity might be tacked to complete the prescriptive right"). *See also Restatement* § 2.17 ("Periods of prescriptive use may be tacked together to make up the prescriptive period if there is a transfer between the prescriptive users of either the inchoate servitude or the estate benefited by the inchoate servitude.").

apply here.[3] Because the railroad crossing was thought to be "public," the court stated, the use of the crossing by the residents would not have "put the landowners on notice that they needed to take action to protect their interests against" the residents. *Albany & Eastern Railroad Co.*, 298 Or App at 109.

There are two responses to that argument. First, even if the mistake regarding whether the crossing was "public" would make a difference in the application of the presumption—which we discuss in greater detail below—the trial court findings indicate that that mistake likely did not arise until around 1953 and thus would have occurred after the prescriptive period of 10 years had run. The trial court found that the use began in 1942 and that "from at least 1953 the railroad treated the crossing as a public crossing." The uncertainty as to the latter date appears to be based on the limited evidence available as to the date when the railroad began to treat the crossing as "public." If that occurred in 1952 or 1953, then the prescriptive period already had run, and the residents' prescriptive easements already had been established, before the crossing began to be treated, mistakenly, as "public."

But even if the mistaken belief as to the "public" nature of the crossing began before the prescriptive period had run, we conclude that that mistake does not preclude the availability of the presumption of adversity on the facts here. We begin by reiterating several facts that undercut AERC's argument. AERC's predecessor knew from the 1928 deed from Murray that it had agreed to construct a "private grade crossing." It also knew that the unpaved road where the crossing was constructed was a private road that existed before it acquired the strips of land from Murray and Sharinghousen and that none of the land at issue was owned by any public body. There is no evidence of any "public" crossing, public right of way, or relevant public property

---

[3] As noted, the Court of Appeals stated that "[t]he trial court's express findings dictate [the] conclusion" that "the nature of the crossing at issue here was such that defendants' use of that crossing was not likely to have put plaintiff on notice that the use was adverse." *Albany & Eastern Railroad Co.*, 298 Or App at 108. The court then quoted facts found by the trial court, all of which relate to the misunderstanding from at least 1953 that the crossing was "public." *Id.*

ownership in 1928, 1942, or at any time before 1953. No reason has been offered as to why AERC's predecessor would not have been on notice that the crossing was "private," rather than public and that Sharinghousen and his successors in interest were using the crossing.

Moreover, the trial court did not accept AERC's argument that the fact that its predecessor installed a "public" designation on the crossbuck constituted sufficient evidence that the landowner had granted *permission* to the general public (or some subset of the public) to use its land. Rather, the trial court found—and the Court of Appeals did not disagree—that there was no evidence that AERC's predecessor ever gave permission to use the crossing to Sharinghousen, any person who purchased from him, any of the current residents, or the general public.[4]

In these circumstances, to allow the mistaken belief of an historical fact—that the crossing was "public" rather than "private"—to interrupt a period of continuous use by the residents and their predecessors for almost 70 years would fly in the face of the basic rules of prescriptive rights. As we said in *Wels*, the "principal justification" for the doctrine of prescription is that "established patterns of land possession and use should be protected and that a diligent occupant should be rewarded at the expense of a careless owner." 360 Or at 577 (internal quotation marks and citation omitted); *see also id.* ("Prescription doctrine * * * penalizes the property owner who sleeps on his or her rights." (Alteration in original; internal quotation marks and citation omitted.)).[5] Here, AERC's predecessors failed,

---

[4] The Court of Appeals framed the issue before it as whether the presumption of adversity "is unavailable here, even though the claimants did not have permission for their use, and their dispute does not involve a common road * * *." *Albany & Eastern Railroad Co.*, 298 Or App at 101.

[5] To be sure, as we emphasized in *Wels*, "the owner of land against whom a prescriptive easement is being claimed must have reason to know of the adverse use of his or her property before being held responsible for failing diligently to take action to protect it." 360 Or at 577. That is the reason for the common road exception: a claimant's use of a road of unknown origin or built by the landowner—along with use by the landowner or others—is unlikely to put the landowner on notice that the use is adverse or hostile to the landowner's interests. AERC argues that the circumstances here are similar to those underlying the common road exception, but that is incorrect. AERC's predecessor did not build the crossing for its own use and did not use the crossing at all, so the use

since at least 1942, and perhaps since 1928, to assert that Sharinghousen and those who purchased lots from him were trespassing when they used the crossing, to prevent them from using it, or to take any action of any kind to protect their right to prevent the unauthorized use of their land.[6] That absence of any action by AERC's predecessor continued after 1953, when the misunderstanding regarding the public status of the crossing apparently arose. AERC's predecessor was a "careless owner" that slept on its rights. It was not until 2012 that AERC sought to exercise its rights as the owner of the crossing, but by then the adverse use had continued for far longer than the prescriptive period, as the trial court found.

No Oregon case has considered whether a mistaken understanding by the claimant or the landowner that a crossing was "public" affects the presumption of adversity or other aspects of prescriptive rights, but other courts have stressed that the *subjective* beliefs and understandings of the parties generally are not relevant in determining whether a use is adverse. In *Cardenas v. Kurpjuweit*, 116 Idaho 739, 779 P2d 414 (1989), the landowner argued that the claimant could not establish a prescriptive easement because the claimant believed, incorrectly, that the land that the claimant was crossing was public. The court stated that "[t]he subjective belief of the claimant is not controlling; rather, the focus is upon the nature of the use exercised by the claimant." 116 Idaho at 740.[7] Similarly, the Washington Supreme Court has held that whether a use is adverse does

---

of the crossing by the residents and their predecessors was visible and apparent to all. Moreover, we agree with the trial court's finding that the residents' use, in fact, was adverse: crossing the tracks plainly created the possibility of a collision between a vehicle using the crossing and a train using the tracks; AERC and its predecessors incurred insurance premium costs to insure against possible harms; and AERC and its predecessors incurred maintenance expenses along the tracks and related to the crossing.

[6] Murray, too, as the owner of an easement by deed also could have prevented Sharinghousen and his successors from using the private crossing at the location of her easement, but there was no evidence that she did.

[7] *See Restatement* § 2.16 illustration 13 ("A, the owner of Whiteacre, used a road crossing Blackacre for access to Whiteacre for the prescriptive period believing that it was a public road. In the absence of other facts or circumstances, the conclusion would be justified that A's use was adverse. A's mistaken belief that the road was public is irrelevant.").

not depend upon the subjective understandings of the parties; rather, it "is to be measured by an objective standard; that is, by the objectively observable acts of the user and the rightful owner." *Dunbar v. Heinrich*, 95 Wash 2d 20, 27, 622 P2d 812 (1980).

Here, the "objectively observable acts of the user and the rightful owner" were that the residents openly and notoriously, and in full view of the rightful owner, continuously used the crossing for decades. And here too, of course, it was always within the ability of the owner, had it been diligent, to review its own property deeds to confirm its ownership of the crossing, including the presence or absence of any recorded easements, and to take action to prevent the repeated trespass by Sharinghousen and those who purchased the residential lots from him. AERC's predecessors failed to do so. We conclude that any subjective misunderstanding regarding the public or private nature of the crossing does not affect the application of the presumption of adversity. Accordingly, whether one takes the initial period of the prescriptive use to begin in 1928, when the Murray crossing was established; in 1942, when the neighborhood was initially created; in 1953, when some of the homes were occupied; or in 1963, when all the homes were occupied, the prescriptive period would have been met, at the latest, by 1973.

For the reasons explained above, we hold that the trial court correctly applied the presumption of adversity to the facts here. AERC did not present evidence of permissive use or other facts that would rebut that presumption. We therefore conclude that each of the residents established a prescriptive easement to use the crossing to access their properties.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.