Argued and submitted June 17, affirmed October 27, 2021

BO AND LIA HOLDINGS LLC
and 2010 W Burnside, LLC,
*Plaintiffs-Appellants,*

*v.*

2021 MORRISON LLC;
Onsite Advertising Services, LLC; and
Big Outdoor Real Estate, LLC,
*Defendants-Respondents.*

Multnomah County Circuit Court
18CV29341; A173325

501 P3d 1109

Plaintiffs appeal a judgment granting summary judgment to defendants and denying plaintiffs' cross-motion for summary judgment. The trial court determined that one of defendants had a prescriptive easement over the east-facing portion of a wall owned by one of plaintiffs, which defendants and their predecessors had used for advertising purposes. On appeal, plaintiffs argue that the trial court erred when it determined that defendants' predecessors' use of the wall for advertising was not permissive or consensual, pointing to an agreement between one of plaintiffs' predecessors and one of defendants. *Held*: The Court of Appeals concluded that the trial court did not err in granting summary judgment to defendants and denying plaintiffs' cross-motion for summary judgment. The summary judgment record reflected no disputed issue of material fact: For nearly two decades prior to this litigation, defendants and their predecessors used the wall for advertising. The use of the wall for advertising was open, notorious, adverse, continuous, and uninterrupted. The agreement pointed to by plaintiffs did not reflect permission to use the wall for advertising, and defendants were entitled to a judgment as a matter of law.

Affirmed.

Leslie G. Bottomly, Judge.

Jonathan M. Radmacher argued the cause for appellants. Also on the briefs was McEwen Gisvold LLP.

E. Michael Connors argued the cause for respondents 2021 Morrison, LLC, and Onsite Advertising Services, LLC. On the brief were Christopher P. Koback and Hathaway Larson LLP.

No appearance for respondent Big Outdoor Real Estate LLC.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

TOOKEY, P. J.

Affirmed.

Aoyagi, J., dissenting.

**TOOKEY, P. J.**

Robert Frost wrote, "Good fences make good neighbors." Robert Frost, *Mending Wall*, in *North of Boston* 11 (1914). Prescriptive easements, perhaps, do not. They are, after all, anathema to many common conceptions of property ownership: They permit a "person to acquire an interest in land without paying the owner for it." *Wels v. Hippe*, 360 Or 569, 578, 385 P3d 1028 (2016), *modified on recons*, 360 Or 807, 388 P3d 1103 (2017). Nevertheless, prescriptive easements serve an important purpose: protecting "established patterns of land possession" by "rewarding the long-time user of property, fulfilling expectations fostered by long use, and conforming titles to actual use of the property." *Albany & Eastern Railroad Co. v. Martell*, 366 Or 715, 720, 469 P3d 748, *modified on recons*, 367 Or 139, 475 P3d 437 (2020) (*Albany*) (internal quotation marks, brackets, and omissions omitted).

In this case, the trial court granted summary judgment to defendants, 2021 Morrison, LLC (Morrison), Onsite Advertising Services, LLC (Onsite), and Big Outdoor Real Estate, LLC (Big Outdoor), determining that Morrison has a prescriptive easement over the east-facing portion of a wall that defendants and their predecessors had used for advertising purposes. The trial court also denied plaintiffs' cross-motion for summary judgment. On appeal, plaintiffs contend that the trial court erred in granting defendants' motions for summary judgment and denying plaintiffs' cross-motion for summary judgment. Among other points, plaintiffs argue that the trial court erred in determining that "Defendants' predecessors' use of Plaintiffs' wall was not permissive or consensual."[1] For the reasons that follow, we affirm.

---

[1] Plaintiffs also contend that the trial court erred by "allowing tacking of use by an occupant that had no landlord-tenant relationship with the owner of Defendants' property" and "granting Defendants a prescriptive easement for air rights and an expanded use that Defendants did not start using until 2012." We reject those arguments without written discussion.

Additionally, plaintiffs contend the easement in this case is akin to a claim for adverse possession under ORS 105.620 but defendants did not have an "honest, good faith belief" of ownership as plaintiffs argue is required to establish adverse possession under that statute. Therefore, in plaintiffs' view, defendants were not entitled to summary judgment on their claim for prescriptive easement.

At the outset, we note that on "appeal of a judgment disposing of cross motions for summary judgment, we review to determine whether there are any disputed issues of material fact and whether either party was entitled to judgment as a matter of law." *Bethlehem Construction, Inc. v. PGE*, 298 Or App 348, 351, 447 P3d 18 (2019) (internal quotation marks omitted); *see also* ORCP 47 C (providing standards for summary judgment).

## FACTS AND PROCEDURAL HISTORY

In this case, the material facts, as reflected in the summary judgment record, are undisputed. Plaintiff Bo and Lia Holdings, LLC (Bo) is the present owner of a lot in downtown Portland on which sits a one-story building. That lot was identified as "Lot 7" in the trial court. Immediately adjacent to Lot 7, to the west, is a lot that was identified as "Lot 6" in the trial court. A three-story building sits on Lot 6. Lot 6 is owned by Morrison.

Given the height disparity between the building on Lot 6 and the building on Lot 7, the upper two-thirds of the eastern wall of the building on Lot 6 is exposed. That exposed, east-facing portion of the wall is the subject of the dispute in this case. For ease of reference, in this opinion, we will refer to that wall as "the Wall."

The Wall was built pursuant to a 1911 agreement (the Party Wall Agreement) between the predecessor owners of Lot 6 and Lot 7. Under the Party Wall Agreement, a one-foot thick and three-story tall "party wall" was to be constructed along the dividing line of Lot 6 and Lot 7, with half of the Wall to be located on Lot 6 and half of the Wall to be located on Lot 7. Further, under the Party Wall Agreement, the owner of Lot 6 and the owner of Lot 7 were each entitled

---

We reject that argument. By its terms, ORS 105.620 applies to persons acquiring "fee simple title to real property." Defendants' prescriptive easement claim did not seek fee simple title, nor were they awarded fee simple title.

Further, to the extent that on appeal plaintiffs might be understood to suggest (separately from their contention that defendants did not meet the requirements for adverse possession) that the type of easement in this case is a servitude not recognized under Oregon law, that contention is not sufficiently developed on appeal, it was not developed before the trial court, and we therefore do not consider it further.

to use the Wall "for all such purposes as party walls are ordinarily used."

After it was constructed, the Wall functioned as one of the walls of the three-story building on Lot 6. That is, the three-story building on Lot 6 is attached to the Wall. In contrast, the one-story building on Lot 7 is approximately 20 inches away from the Wall. It is not connected to the Wall.

In May 1997—over 80 years after the Party Wall Agreement was entered into—Onsite entered a lease agreement with the owners of Lot 6 to lease the eastern side of the Wall.[2] Onsite's primary business is outdoor advertising. Onsite enters into leases with the owners of structures that can be used for outdoor advertising, which permit Onsite to place advertisements on the structures. Onsite then enters into agreements with businesses that desire to place advertisements on the structures.

The lease agreement that Onsite entered into with the owners of Lot 6 provided that

"the Lessor hereby leases unto the Lessee a vertical wall in its entirety facing east of the building located [on Lot 6], hereinafter called the 'wall' for the purpose of displaying a painted mural, painted sign or painted wall decoration."

As consideration, the owners of Lot 6 were to receive a monthly payment "equal to 25% *** of advertising revenue generated by lessee." The agreement had a term of 10 years, with an option to the lessee to renew the lease for an additional 10 years.

---

[2] Though it does not affect our analysis, we note that in May 1997, Lot 6 was owned by Viking Investment Corporation (Viking), Gary Johndahl, Michael Johndahl, and Terry Johndhal.

Notwithstanding that Viking and the Johndahls owned Lot 6, the May 1997 lease agreement was entered into by Onsite, as lessee, and "Kingston Investment Corporation" (Kingston), as lessor. The reason for the discrepancy between the lessor identified in the 1997 lease agreement and the actual ownership of Lot 6 is unclear; we note, however, that the building on Lot 6 is commonly referred to as the "Kingston Building."

In any event, the 1997 lease agreement was executed by Gary Jondahl, and an addendum to the 1997 lease agreement was also executed by Gary Jondahl as "representative of the ownership group" of the owners of Lot 6 (i.e., Viking and the Johndahls). And the owners of Lot 6 and Onsite performed under the 1997 lease agreement.

Onsite, however, perceived "two potential issues" with using the Wall for advertising. First, there were billboards atop the one-story building on Lot 7, which, to some extent, obstructed the view of the Wall. Second, Onsite was concerned with the possibility that the owner of Lot 7 could add a second story to the building on Lot 7, which could obstruct the view of any advertisements appearing on the Wall.

For that reason, in March 1998, Onsite entered a written agreement with the then-owner of Lot 7, Fischer (the 1998 Agreement). The 1998 Agreement provided that

> "Fischer agrees to have the existing billboards, affixed to her building * * * removed to expose the adjacent building's wall directly to the west and behind them so that Onsite may use said wall for painted advertising messages."

Additionally, in the 1998 Agreement, Fischer agreed "not to build up or add a second floor to the existing building [on Lot 7] for a minimum of 60 months from the start" of the 1998 Agreement; to provide Onsite with notice if she intended to build a second floor; and provided that if Fischer "builds a second story or remodels the existing building upward in any way that causes view of the advertising wall to be obstructed, Onsite may end this agreement in its entirety * * * without any compensation due to Fischer from the date of such obstruction."

In exchange, Onsite agreed to pay Fischer a lump sum of $5,000 immediately, followed by another lump sum of $13,000, due after removal of the billboards affixed to the top of the building on Lot 7. Additionally, starting two years after the billboards affixed to the top of the building on Lot 7 were removed by Fischer, Onsite was to pay $750 per month to Fischer for the duration of the agreement. The 1998 Agreement had a duration of 120 months, "commencing on the date of billboard removal," and provided Onsite with the right to extend the agreement for an additional 120 months.

During negotiation of the 1998 Agreement, Fischer stated that she did not want any flower shops advertised on the Wall, because the tenant in the building on Lot 7

was a flower shop. Onsite and Fischer accordingly agreed to a provision in the 1998 Agreement stating, "Onsite will not advertise any type of product, service or business that would, in any way, compete with tenants of the existing building."

Important to our analysis in this case, the 1998 Agreement also provided that

> "[t]his agreement relates solely to consideration being paid for the removal of billboards to open the space above Fischer's building, and Fischer has no responsibility with respect to said adjacent building, or the availability of the wall which Onsite intends to use for advertising."

After entering the agreements with the owners of Lot 6 and with Fischer, Onsite entered an agreement with a third party who wanted to advertise on the Wall, and advertising was placed on the Wall in 1999.

The 1998 Agreement expired 120 months after its commencement and was not renewed; payments to Fischer ceased in June 2009. At that time, Lot 6 had been sold to Morrison. The 1998 Agreement was not renewed, because Morrison and the then-lessee of the Wall from Morrison "concluded there was no reason to renew and continue to pay under the [1998 Agreement] because it was unlikely that the City of Portland would approve any significant development on Ms. Fischer's lot."

Additionally, in 2009, Fischer expressed to Morrison, with reference to the Party Wall Agreement, that she believed she had some right to the advertising revenue from the Wall. Morrison disagreed with Fischer and communicated to her that it did not believe that she had any rights to advertising revenue generated from advertising on the Wall. Negotiations between Morrison and Fischer ensued. At some point, there was an exchange between Fischer's counsel and Morrison's counsel, wherein Fischer's counsel asserted that Morrison's use of the Wall was "trespassing" on Fischer's property. Morrison's counsel responded, among other points, that "the 1998 Agreement *** establishes [Fischer] consented to use the wall," and "consent is a defense to trespass." After expiration of the 1998 Agreement, no further

agreement was reached between the owners of Lot 7 and owners of Lot 6 regarding use of the Wall.

Over the ensuing years, the Wall continued to be used for advertising, and various transactions occurred. As relevant to this litigation, Bo presently owns Lot 7, and Morrison presently owns Lot 6. Big Outdoor is presently the lessee of the Wall from Morrison. And, in 2018, the day before this litigation was filed, plaintiff 2010 Burnside, LLC (Burnside) entered an agreement with Bo, under which Bo purported to grant Burnside an "exclusive easement" to use the portion of the Wall located on Lot 7 (*i.e.*, the eastern-facing portion of the Wall) and to use Bo's airspace on Lot 7.

In 2018—the day after Bo and Burnside entered into the above-described agreement—Bo and Burnside brought suit against Onsite and Morrison, asserting claims for trespass, private nuisance, declaratory judgment, and unjust enrichment. Plaintiffs later added Big Outdoor as a defendant.

In their answer and counterclaims, Onsite and Morrison asserted "prescriptive easement" as an affirmative defense, alleging that Morrison had acquired a prescriptive easement "to use the 6 easterly inches of the Party Wall for advertising purposes, including leasing the easterly 6 inches to third parties, based upon their continuous use of the Party Wall for advertising purposes since 1999." Additionally, in their answer and counterclaims, Onsite and Morrison sought a declaration that "the owners of Lot 6, including *** Morrison, acquired a prescriptive easement," and that Morrison has "exclusive right to use the Party Wall for advertising purposes." Big Outdoor, in its answer, likewise asserted "prescriptive easement" as an affirmative defense.

The parties filed cross-motions for summary judgment. Defendants argued, among other points, that "to establish a prescriptive easement, a claimant must show open or notorious use of property that is adverse to the rights of the owner for a continuous and uninterrupted period of 10 years"; that "[i]n cases not involving existing roads constructed by the owner of the servient estate or of unknown

origin, open use for the prescriptive period gives rise to a rebuttable presumption that the use was * * * adverse to the rights of the owner," which the owner can rebut by showing that the use was "made with permission"; and that the 1998 Agreement between Fischer and Onsite did not render use of the Wall by the Lot 6 owners permissive.

Plaintiffs responded, among other points, that "advertising was placed on the wall because of an agreement between Ms. Fischer and Onsite" and, during the pendency of that agreement, the use was "consensual, and therefore not hostile."

The trial court determined that there was no "question of fact" with respect to open, continuous, and uninterrupted use, which created a "presumption of adversity." The trial court further determined that, given the summary judgment record, whether that presumption was "overcome" by "permission" to use the Wall turned on the 1998 Agreement between Onsite and Fischer; that interpretation of that agreement is a question of law; and that, "having read the agreement as a whole," there was no "reasonable interpretation that it provides permission for advertising." The trial court concluded that the only interpretation of the 1998 Agreement "that is reasonable is that it was a contract to remove billboards and other provisions relating to not building a second floor."

In explaining its rationale, the trial court noted its view that the only phrase one could "kind of claw at to try to twist into" an interpretation of granting permission to place advertising on the Wall is the clause stating that "Fischer agrees to have the existing billboards * * * removed to expose the adjacent building's wall directly to the west and behind them so that Onsite may use said wall for [painted] advertising messages." But, in the trial court's view, that clause was merely providing "the purpose for removing the billboard," and it was not a grant of permission, "particularly in light of the language * * * stating that this agreement relates solely to consideration being paid for removal of billboards to open the space." The trial court also noted the clause in the agreement stating "Fischer has no responsibility with respect to said adjacent building or the availability of the wall, which

Onsite intends to use for advertising," and stated that that clause was "directly contradictory" to any permission being given by Fischer to Onsite to use the wall.

With regard to the 2009 statement by Morrison's counsel regarding the meaning of the 1998 Agreement—*i.e.*, that Fischer "consented to use the wall," and "consent is a defense to trespass"—as well as other statements Morrison's counsel made, the trial court noted that those interpretations do not present "issues of fact," but they are "just lawyer interpretations," which the trial court was "not bound by." The trial court emphasized that the record did not contain evidence, other than the 1998 Agreement between Fischer and Onsite, regarding whether use of the Wall for advertising was permissive. The trial court noted, for example, that it was not a case where there was deposition testimony regarding a conversation where permission to use property was given.

Accordingly, the trial court entered a judgment in favor of defendants. The judgment declared that Morrison had acquired a prescriptive easement over that portion of the eastern-facing wall that defendants and their predecessors had used for advertising purposes, but noted that such easement does not restrict plaintiffs' rights under the Party Wall Agreement to use the Wall for purposes identified in the Party Wall Agreement, and does not restrict plaintiffs' use of the air rights of Lot 7. The judgment also dismissed plaintiffs' claims with prejudice.

Plaintiffs appeal that judgment.

## ANALYSIS

As noted above, "On appeal of a judgment disposing of cross motions for summary judgment, we review to determine whether there are any disputed issues of material fact and whether either party was entitled to judgment as a matter of law." *Bethlehem Construction, Inc.*, 298 Or App at 351.

Recently, in *Hisey v. Patrick*, we explained:

"An easement is a nonpossessory interest in another's land that entitles the holder of the easement to use the burdened property for some particular purpose. Although

easements ordinarily must be created in writing, there are exceptions to that general rule. One is that easements may be created by prescription, meaning use over time and the operation of law. The equitable doctrine of prescriptive easements evolved to resolve conflicts between two competing interests: the interest of property owners in controlling the use of their property and the societal interest in protecting established patterns of land possession and use. However, the doctrine in essence allows a person to obtain a property interest without paying for it, and for that reason prescriptive easements are disfavored."

309 Or App 625, 632-33, 484 P3d 377, *rev den*, 368 Or 347 (2021) (internal quotation marks and citation omitted). "A prescriptive easement arises when a [party] demonstrates—by clear and convincing evidence—open, notorious, and adverse use of another's property for a continuous and uninterrupted period of at least 10 years." *Id.* at 633.

As a preliminary matter, we note that, in our view, the trial court did not err in determining that there were no disputed issues of material fact with regard to whether Morrison and its predecessor-in-interest had engaged in open and notorious use of the east side of the Wall for advertising for a continuous and uninterrupted period of at least 10 years. The undisputed evidence is that they had, in fact, used the east-facing side of the Wall for that purpose for more than 10 years. Thus, the balance of this opinion concerns whether such use was "adverse" as a matter of law.

"An adverse use is a use made without the consent of the landowner, or holder of the property interest used, and without other authorization." *Albany*, 366 Or at 722 (internal quotation marks omitted). The "*subjective* beliefs and understandings of the parties generally are not relevant in determining whether a use is adverse"; rather, in determining whether use is adverse, the Supreme Court has looked to the "objectively observable acts of the user and the rightful owner." *See id.* at 728-29 (internal quotation marks omitted).

"Courts have long recognized the evidentiary difficulties of determining whether a longstanding use of land was initially adverse and have used presumptions to aid in

that task." *Id.* at 721. In Oregon, "the presumption of adversity based on open and notorious use for the prescriptive period applies in ordinary cases, in which the person claiming the easement by prescription is a stranger to the landowner; under such circumstances, it makes sense to assume that obvious use of the owner's property is adverse to [the owner's] rights." *Id.* at 721-22 (internal quotation marks omitted). That presumption does not apply, however, "when the nature of the land or the relationship between the parties is such that the use of the owner's property is not likely to put the owner on notice of the adverse nature of the use." *Wels*, 360 Or at 579.

The Supreme Court has recognized two "longstanding exceptions to the presumption of adversity." *Albany*, 366 Or at 723. "The first exception is where the landowner gives the user permission; in those circumstances, the use, by definition, cannot be adverse." *Id.* at 722.[3] The "permissive use" exception requires "some evidence of actual communicated permission." *Hisey*, 309 Or App at 636. "[M]ere acquiescence is not enough ***." *Hayward v. Ellsworth*, 140 Or App 492, 497, 915 P2d 483 (1996) (internal quotation marks omitted); *see also Feldman et ux. v. Knapp et ux.*, 196 Or 453, 472, 250 P2d 92 (1952) ("Evidence of mere acquiescence in, as distinguished from permission for, such use on the part of the owners of the servient estate is insufficient for the purpose [of rebutting the presumption of adversity].").

The second exception is the "'common road' exception," which "recognizes that, when the landowner and the claimant (and perhaps other users) make use of a road that was constructed by the landowner or is of unknown origin, it is more reasonable to assume that the use was pursuant to a friendly arrangement between neighbors rather than to

---

[3] In *Albany*, the Supreme Court characterized permission as an "exception" to the presumption of adversity. 366 Or at 722-23. As noted above, the trial court considered whether evidence of Fischer's "permission" could "overcome" the presumption of adversity, which we understand to be consistent with how we and the Supreme Court have, on some occasions, described the presumption of adversity and the exceptions thereto. *Martin v. G.B. Enterprises, LLC*, 195 Or App 592, 596, 98 P3d 1168 (2004) ("However, a presumption of adverse use may be rebutted by evidence that the use was permissive."); *Feldman et ux. v. Knapp et ux.*, 196 Or 453, 472, 250 P2d 92 (1952) (noting presumption of adversity can be "rebut[ted]" by evidence of permission).

assume that the user was making an adverse claim." *Albany*, 366 Or at 722-23 (internal quotation marks omitted).

As noted above, on appeal, plaintiffs argue the trial court erred in determining that "Defendants' predecessors' use of Plaintiffs' wall was not permissive or consensual." Plaintiffs argue that, "[a]s a matter of law, the trial court should have dismissed Defendants' prescriptive easement counterclaim and entered judgment in favor of Plaintiffs' request for declaratory relief."

More specifically, as plaintiffs see it, the 1998 Agreement is "at the heart of the dispute between the parties to this appeal" and "the question is whether the 1998 Agreement reflected a consensual and permissive arrangement as opposed to a hostile use of property." Plaintiffs posit that the 1998 Agreement reflects that defendants "obtained Ms. Fischer's permission and consent to use the wall for advertising." Although, on appeal, plaintiffs concede that the 1998 Agreement "was not an explicit grant of permission by Ms. Fischer *** for Onsite to use Ms. Fischer's wall," in their view, "it unambiguously was a permissive arrangement such that subsequent use of the wall for advertising *** was permissive and not hostile." In support of that argument, plaintiffs point to various provisions in the 1998 Agreement and, among other statements by Morrison's counsel, Morrison's counsel's 2009 statement that "the 1998 Agreement *** establishes [Fischer] consented to use the wall."[4]

Defendants, for their part, agree with plaintiffs concerning the importance of the 1998 Agreement to resolving this appeal.[5] In defendants' view, however, defendants "and their predecessors' use of the Wall for advertising was adverse, not permissive." Defendants contend that the 1998

---

[4] Plaintiffs note that "no one apparently knew in 1998 that Ms. Fischer owned one-half of the party wall" but do not point to any evidence in the record regarding what Fischer's understanding of her ownership of the Wall was in 1998. It is worth recalling, however, that the building on Lot 7 is *not* attached to the Wall, which would suggest that one might have to know the terms of the Party Wall Agreement—executed in 1911—to realize that half of the Wall belonged to the owner of Lot 7.

[5] We note that the only defendants to file a brief on appeal were Morrison and Onsite.

Agreement is an "unambiguous written agreement" and that the "trial court correctly construed the 1998 Agreement and determined based on its plain language it was not intended nor did it grant Onsite permission to use the Wall."

We agree with plaintiffs that the 1998 Agreement is "at the heart" of this dispute. Whether the presumption of adverse use applies turns on the meaning of the 1998 Agreement and, specifically, whether that agreement granted Onsite permission to use the Wall, such that Onsite's use of the Wall was permissive. That is because, in our view, absent such permission, this case is akin to an "ordinary case," in which "it makes sense to assume that obvious use of the owner's property is adverse to his or her rights," *Albany*, 366 Or at 721-22 (internal quotation marks omitted), and the 1998 Agreement is the only evidence in the summary judgment record that might reflect such permission. To the extent plaintiffs argue that the facts in this case are akin to a "friendly arrangement between neighbors," such that something akin to the "common road" exception to the presumption of adversity applies, we reject that argument; nothing in the record reflects that the arrangement between Onsite and Fischer was anything other than an arms-length business transaction or that Fischer had any sort of "friendly arrangement" with the owners of Lot 6 or Onsite. Therefore, unless the 1998 Agreement reflects "actual communicated permission," *Hisey*, 309 Or App at 636, to use the Wall, such that the permissive use exception to the presumption of adversity applies, the trial court did not err in determining that Morrison's use of the Wall for advertising was adverse.

To start, we observe that the 1998 Agreement is a contract. Accordingly, to understand the meaning of the 1998 Agreement, we are guided by principles of contract interpretation.

A "fundamental premise under Oregon law [is] that the intent of the parties to a contract controls a court's interpretation of it." *CACV of Colorado v. Stevens*, 248 Or App 624, 645, 274 P3d 859, *rev den*, 352 Or 377 (2012). We "attempt to discern the intent of the parties in light of the circumstances that existed when the agreement was reached." *Dalton v.*

*Robert Jahn Corp.*, 209 Or App 120, 135, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007). To do so, "[w]e examine the text, context, and extrinsic evidence of the circumstances underlying the contract's formation to decide whether the contract is ambiguous." *Oatney v. Premo*, 275 Or App 185, 208, 369 P3d 387 (2015), *rev den*, 359 Or 847 (2016); ORS 42.220 ("In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."). If a contract is ambiguous, "the trier of fact resolves the ambiguity through reference to extrinsic evidence of the parties' intent." *Oatney*, 275 Or App at 208-09. "In the absence of an ambiguity, the court construes the words of a contract as a matter of law." *Yogman v. Parrot*, 325 Or 358, 361, 937 P2d 1019 (1997). "A contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable construction." *Cryo-Tech, Inc. v. JKC Bend, LLC*, 313 Or App 413, 423, 495 P3d 699 (2021).[6]

In this case, we conclude that there is no plausible, reasonable construction of the 1998 Agreement in which that agreement could be understood to grant permission from Fischer to Onsite (or the owners of Lot 6) to use the Wall for advertising: It unambiguously does not. Thus, the trial court did not err in construing the 1998 Agreement.

As described above, under the 1998 Agreement, Fischer agreed to remove the billboards affixed to the roof of the building on Lot 7 and to refrain from adding a second story to the building on Lot 7, and Onsite agreed to make payments to Fischer. Central to our analysis of whether the 1998 Agreement granted permission to use the Wall is the provision stating "[t]his agreement relates solely to

---

[6] On appeal, notwithstanding plaintiffs' contention that the 1998 Agreement is at the "heart of the dispute" and its reliance on various provisions of that agreement, plaintiffs assert that, in understanding the import of the 1998 Agreement, we should disregard our usual method of contract interpretation because that method applies when a "court evaluates a party's contractual obligations in the context of a claim of breach," but, here, "the question is whether the 1998 Agreement reflected a consensual and permissive arrangement." We disagree that a different method of contract interpretation applies.

consideration being paid for the removal of billboards to open the space above Fischer's building, and Fischer has no responsibility with respect to said adjacent building, or the availability of the wall which Onsite intends to use for advertising."

The only plausible reading of that provision is that it states the purpose for which Onsite was entering the 1998 Agreement and providing consideration to Fischer— to "open the space above Fischer's building"—and Fischer's affirmative responsibilities under the agreement to obtain said consideration—the "removal of billboards." It also reflects that Onsite was *not* providing consideration to Fischer in exchange for Fischer's permission to use the Wall for advertising; to the contrary, in the 1998 Agreement, Fischer expressly disclaimed "responsibility with respect to said adjacent building" (which includes the Wall) and "the availability of the wall which Onsite intends to use for advertising."

The structure of the termination and compensation provisions of the 1998 Agreement also bear out the understanding that the 1998 Agreement was not an agreement granting Fischer's permission to Onsite to use the Wall.

Under the 1998 Agreement, Fischer—who, as noted above, disclaimed responsibility for the Wall and the availability of the Wall for advertising—was to receive $750 per month for eight years from Onsite, regardless of whether the Wall was available for use by Onsite. And Onsite could only cease such payments in the event Fischer took action with regard to her building which caused the "advertising wall to be obstructed." Given that Onsite was obligated to pay Fischer on a monthly basis regardless of whether the Wall was available for advertising and that Fischer expressly disclaimed responsibility for making the Wall available for advertising, it is implausible to read the 1998 Agreement as granting Fischer's permission to Onsite to use the Wall for advertising.

To be sure, as the trial court noted, the 1998 Agreement does state that Fischer was agreeing "to have the existing billboards, affixed to her building * * * removed to expose the adjacent building's wall directly to the west and

behind them so that Onsite may use said wall for painted advertising messages." But we agree with the trial court that that provision, read in the context of the agreement as a whole, was setting forth the purpose for removing the bill-boards and that it was not providing Fischer's permission to use the Wall.

Consideration of "extrinsic evidence of the circum-stances underlying the contract's formation," *Oatney*, 275 Or App at 208, also support the understanding that the 1998 Agreement unambiguously does not grant permission to Onsite to use the Wall. The summary judgment record reflects that, at the time Onsite approached Fischer about entering the 1998 Agreement, Onsite had already entered into an agreement with the Lot 6 owners allowing Onsite to use the Wall for advertising. Onsite pursued the 1998 Agreement to remove the existing billboards on Fischer's building because the billboards partially obstructed the Wall and Onsite was concerned Fischer could potentially construct a second story on her building that would also obstruct the Wall.

In urging us to reach a contrary result, plaintiffs point to the provision of the 1998 Agreement stating that "Onsite will not advertise any type of product, service or business that would, in any way, compete with tenants of the existing building." In plaintiffs' view, that "reservation of control on the content of advertising by Ms. Fischer *** reflects the permissive nature of the arrangement between Ms. Fischer and Onsite." We do not, however, view that lim-itation on Onsite's use of the Wall to reflect that Fischer granted permission to Onsite to use the Wall for other purposes. Rather, given the summary judgment evidence regarding how that provision of the 1998 Agreement came about, as described above, we understand that provision to have been an inducement offered by Onsite to assuage Fischer's concern that, if she removed the billboards on the top of her building, Onsite would display advertisements that competed with her tenant.

Plaintiffs also point to Morrison's counsel's 2009 statement to Fischer's counsel—made in the context of Fischer's suggestion that Morrison was trespassing—that

"the 1998 Agreement *** establishes [Fischer] consented to use the wall" and "consent is a defense to trespass." But that statement does not affect our analysis of the meaning of the 1998 Agreement in this case: That statement was made 11 years after the then-owners of Lot 6 and Fischer entered into the 1998 Agreement by counsel for a party—Morrison—who was not a signatory to the 1998 Agreement, and the statement was made in the context of communications concerning threatened litigation. We do not believe it to have any bearing here.

## CONCLUSION

In sum, given the foregoing, we conclude that the trial court did not err in granting summary judgment to defendants on plaintiffs' claims and granting Morrison and Onsite the declaratory relief that they sought by way of their counterclaim. The summary judgment record reflects no disputed issue of material fact: For nearly two decades prior to this litigation, the Wall was used by the owners of Lot 6 for advertising purposes. The use of the Wall for advertising was open, notorious, adverse, continuous, and uninterrupted. And defendants were entitled to a judgment as a matter of law. Therefore, we affirm.

Affirmed.

**AOYAGI, J.,** dissenting.

I generally agree with the majority's analysis of the merits of each issue that it addresses. The reason that I write separately is not to take a different view of anything the majority addresses, but rather to highlight an issue that the majority does *not* address, which, in my view, would be dispositive if it did.

This case involves a most unusual "easement." Essentially, defendant 2021 Morrison, LLC (Morrison) has an exclusive right to use property owned by plaintiff Bo & Lia Holdings (Bo)—specifically to make a profit by leasing the surface of a party wall located on Bo's property—until such time as Bo decides to attach a building to that wall (if it can obtain the permits to do so), at which point Morrison's "easement" ceases to exist. Although such an arrangement

could certainly be made by express agreement, I am unaware of any Oregon precedent for creating such an "easement" by prescription. Of particular note, the only apparent reason that Bo retains the right to attach a building to the wall on its land—even though it will clearly interfere with Morrison's "easement"—is because Morrison has chosen to give Bo that one stick from the bundle of sticks to which property rights are often compared. And it is a stick that Morrison apparently believes has little value, as there is evidence that Morrison considers it "unlikely that the City of Portland would approve any significant development" on Bo's lot.

As they did in the trial court, plaintiffs argue on appeal that Morrison's prescriptive-easement claim fails as a matter of law because, among other reasons, Morrison cannot obtain the rights it is claiming as a prescriptive easement. As part of that argument, plaintiffs contend that what Morrison sought (and obtained) is really an exclusive possessory interest, akin to ownership by adverse possession, but styled as a "prescriptive easement" to avoid the requirements for adverse possession.

That is not a specious argument. Other courts have recognized that claimants have an incentive to mischaracterize their claims as being for a "prescriptive easement" to avoid the requirements for adverse possession. *See, e.g.*, *Hansen v. Sandridge Partners, LP*, 232 Cal Rptr 3d 247, 256 (Cal App 2018) (stating that "claimants have often tried to obtain the fruits of adverse possession under the guise of a prescriptive easement" to avoid the requirements for adverse possession, and that "[t]he law prevents this sophistry with the following rule: If the prescriptive interest sought by a claimant is so comprehensive as to supply the equivalent of an estate, the claimant must establish the elements of adverse possession, not those of a prescriptive easement."); *Courville v. Kohn*, 12 LCR 455, 2004 Mass LCR Lexis 108 at *20-21 (Mass Land Court 2004) (treating a claim for an "exclusive prescriptive easement" as equivalent to an adverse-possession claim). That incentive certainly exists in Oregon, given the stringent "honest belief" requirement that applies only to adverse-possession claims. *See* ORS 105.620 (stating statutory elements for adverse possession).

The majority dismisses plaintiffs' arguments on this issue in a footnote. It first rejects plaintiffs' contention that "the easement in this case is akin to a claim for adverse possession under ORS 105.620" and should therefore be subject to the requirements of ORS 105.620, reasoning that, on its face, ORS 105.620 applies only to persons acquiring "fee simple title to real property" and that the trial court did not award fee simple title to defendants. 315 Or App at 374 n 1. The majority then rejects any argument by plaintiffs "that the type of easement in this case is a servitude not recognized under Oregon law," stating that such argument will not be considered because it was "not developed before the trial court." *Id*.

I agree with the majority that the requirements of ORS 105.620 do not apply to prescriptive easements. But, in my view, that misses the point. As I understand it, plaintiffs argue that Morrison cannot legally prevail on its prescriptive easement claim because what Morrison is calling a prescriptive easement is not a prescriptive easement and is not available as a prescriptive easement. In that vein, plaintiffs argue that what Morrison is claiming is more akin to ownership by adverse possession and should be held to that standard. Even if we might frame the latter point a bit differently from plaintiffs, whose arguments track language from the California and Massachusetts cases, their fundamental argument is clear, and I cannot agree that it was not developed in the trial court. There is little purpose debating preservation in a separate opinion, so I will simply say that, on this record, it is my view that plaintiffs preserved their argument in the trial court, they have advanced it on appeal, and we should address it.

As for the merits, "[a]n easement is an interest in another's land, which grants its owner a right of limited use or enjoyment." *Wels v. Hippe*, 360 Or 569, 576, 385 P3d 1028 (2016), *modified on recons*, 360 Or 807, 388 P3d 1103 (2017). "Because it is an interest in land, an easement ordinarily must be created in writing," but exceptions exist, one of which allows an easement to "be created by prescription," *i.e.*, "through use over time and the operation of law." *Id*. at 577. "[P]rescriptive easements are not favored by the law." *Id*. at 578. "After all, the doctrine permits one person to

acquire an interest in land without paying the owner for it." *Id*.

It is a "fundamental property law principle[] \*\*\* that the establishment of a prescriptive easement does not create an exclusive right to use the property encompassed thereby." *Ingle Butte Ranches, Inc. v. Fronapel*, 183 Or App 478, 483, 53 P3d 453, *rev den*, 335 Or 104 (2002). An easement is "'nonposessory'" in nature and "'generally authorizes limited uses of the burdened property for a particular purpose.'" *ODOT v. Alderwoods (Oregon), Inc.*, 358 Or 501, 512, 366 P3d 316 (2015) (quoting *Restatement (Third) of Property (Servitudes)* § 1.2 comment d (2000)). It normally does not exclude the property owner's own use. *See U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 US ___, ___, 140 S Ct 1837, 1844, 207 L Ed 2d 186 (2020) ("[B]ecause an easement does not dispossess the original owner, *Barnard v. Gaumer*, 146 Colo 409, 412, 361 P2d 778, 780 (1961), 'a possessor and an easement holder can simultaneously utilize the same parcel of land,' J. Bruce & J. Ely, Law of Easements and Licenses in Land § 1:1, p. 1-5 (2015).").[1]

Moreover, because the recognition of a prescriptive easement "is inconsistent with the right of the servient owner to fully utilize the servient land"—causing them to be disfavored as previously noted—"[c]ourts carefully scrutinize claims of easement by prescription." Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 5:3 at 343 (2021). When the servitude sought is more than a limited nonexclusive use and tilts toward a possessory interest, careful scrutiny is even more important. *See Hansen*, 232 Cal Rptr 3d at 256 (recognizing that "prescriptive easement" claims may be misused "to obtain the fruits of adverse possession"). Here, in my view, Morrison sought property rights that could not be obtained by prescriptive easement, and the trial court therefore erred in granting it such rights as a prescriptive easement. Accordingly,

---

[1] *See Barnard*, 146 Colo at 412 ("An easement does not carry any title to the land over which it is exercised and the easement does not work a dispossession of the landowner. The owner of the servient estate continues to enjoy all the rights and benefits of proprietorship consistent with the burden of the easement. Going a step further, it is also the rule that the grantor of an easement, and his assigns, have a right of user in common with the grantee." (Internal citation omitted.)).

although I agree with the majority's reasoning on the issues that it addresses, I would not reach those issues and instead would reverse for the reason described.

In addition to explaining my point of disagreement with the majority, I hope that this separate opinion draws attention to what the majority is *not* saying. The majority opinion does not endorse the existence under Oregon law of a "prescriptive easement" by which the easement holder may exclude the property owner from any use of the property, except such use as the easement holder chooses to allow. Nor is the majority opinion endorsing a "prescriptive easement" that exists solely to allow the easement holder to profit from leasing the property to third parties for their exclusive use. The majority opinion expresses *no view* on those issues. *See* 315 Or App at 374 n 1. To the extent that fact might get lost by it being tucked into a footnote, I emphasize it here.